803 F.2d 1308
 FIRST STATE UNDERWRITERS AGENCY OF NEW ENGLAND REINSURANCE CORPORATION
v.
TRAVELERS INSURANCE COMPANY and Certain-Teed Products
Corporation and Rollins, Burdick, Hunter, Company
of Pennsylvania, Inc., (Defendant
third-party plaintiff)
v.
JOHNSON & HIGGINS OF PENNSYLVANIA, INC. (third-party defendant).
Appeal of FIRST STATE UNDERWRITERS AGENCY OF NEW ENGLAND
REINSURANCE CORPORATION.
 Nos. 85-5104, 85-5341.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1986.
Decided Oct. 27, 1986.
As Amended Nov. 18, 1986.
Rehearing and Rehearing En Banc Denied Dec. 5, 1986.
 
 Mark L. Rosen (argued), Siff, Newman, Rosen & Parker, P.C., New York City, for appellant.
 Kevin E. Wolff (argued), Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, N.J., for Certain-Teed Corp.
 Daniel J. Graziano, Jr., Smithson & Graziano, Trenton, N.J., for Rollins Burdick Hunter of Pa., Inc.
 Samuel A. Larner (argued), Budd, Larner, Ken, Gross, Picillo, Rosenbaum, Greenberg & Sade, P.C., Newark, N.J., for Travelers Ins. Co.
 Before WEIS, HIGGINBOTHAM and BECKER, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This is an appeal from the final orders of the district court in a declaratory judgment action brought by First State Underwriters Agency of New England Reinsurance Corporation ("First State") pursuant to 28 U.S.C. Sec. 1332 and 28 U.S.C. Sec. 2201. The United States District Court for the District of New Jersey (1) granted summary judgment in favor of defendants, Certain-Teed Products Corporation ("Certain-Teed") and Travelers Insurance Company ("Travelers"); (2) denied First State's cross-motion for summary judgment; and (3) awarded attorney's fees to both defendants. For the reasons that follow, we will reverse and remand to the district court for proceedings consistent with this opinion.
 
 I.
 
 2
 This appeal arises out of a complaint filed by First State against Certain-Teed and Travelers seeking a declaratory judgment concerning the rights and liabilities of the parties under a primary insurance policy issued by Travelers to Certain-Teed and certain umbrella policies issued by both First State and Travelers to Certain-Teed. During the relevant period Certain-Teed carried both a primary insurance policy and an excess umbrella policy issued by Travelers which covered the periods from July 1, 1974 to July 1, 1977, and July 1, 1974 to July 1, 1975 respectively. In addition, Certain-Teed was insured under an umbrella policy issued by First State effective September 17, 1975 through July 1, 1976.
 
 
 3
 For several years prior to 1975, Certain-Teed, through its insurance broker, Johnson & Higgins ("J & H"), had maintained both its primary and excess comprehensive general liability policies with Travelers. Some time before July 1, 1975, Travelers informed Certain-Teed that the July 1 renewal premium for its umbrella policy, which provided Certain-Teed with coverage of $10,000,000 excess of the primary policy's $1,000,000 aggregate limit, would increase from approximately $12,500 to approximately $431,790. Due to Certain-Teed's unwillingness to pay the increased premium, J & H attempted to find another insurer for Certain-Teed's excess coverage. John Kutzler, Certain-Teed's insurance manager, renewed the Travelers primary policy and negotiated an agreement with Travelers under which the excess policy would continue in effect at a reduced premium from the July 1, 1975 renewal date until Certain-Teed purchased excess coverage from a different carrier.
 
 
 4
 Subsequently, in mid-September 1975, Certain-Teed, through new brokers, Rollins, Burdick, Hunter, Company of Pennsylvania ("RBH")[1], acquired substitute excess coverage from First State and Stonewall Insurance Company ("Stonewall") effective from September 17, 1975 to July 1, 1976. The First State policy provided the first $5,000,000 layer of excess coverage at an annual premium of $164,000, and the Stonewall policy provided a second layer of $5,000,000 coverage at an annual premium of $25,000. Accordingly, Certain-Teed terminated its excess umbrella coverage with Travelers.
 
 
 5
 The dispute underlying the declaratory judgment action and the instant appeal grew out of a lawsuit commenced in California in which Certain-Teed was named as a party defendant. In that action, entitled Central National Insurance Co. v. Keene Corp. and Certain-Teed Products Corp., et al., a jury verdict of $1,049,175.90, plus pre-judgment interest calculated at seven percent (7%), was entered in favor of the plaintiff. A compromise settlement of this verdict in the amount of $1,150,000 was subsequently reached with Certain-Teed's share of the settlement set at $414,477.50.
 
 
 6
 While the Central National Insurance action was pending, Travelers advised Certain-Teed and First State that there remained only $280,658 of the $1,000,000 aggregate limit of the Travelers primary policy. Thus, Travelers expressed its intention to pay only the $280,658 towards the settlement of the Central National Insurance action. Thereafter, Certain-Teed made demands upon First State to pay the $133,819 balance under the First State excess policy. First State refused, however, maintaining that Certain-Teed had not exhausted the limits of liability of the underlying Travelers primary policy during the policy period of First State's umbrella policy as required by that policy. Eventually, Certain-Teed, Travelers and First State reached an agreement under which the three companies each paid one-third of the Central National Insurance settlement to the extent that it exceeded the aggregate limits of the Travelers primary policy ($44,606.50 each). The parties agreed that all rights were reserved and the dispute would be resolved by commencement of a declaratory judgment action.
 
 
 7
 Shortly after First State initiated the declaratory judgment action, Certain-Teed, Travelers and First State all moved for summary judgment. Certain-Teed and Travelers urged in their motions for summary judgment that the terms and conditions of the First State umbrella policy required exhaustion of the aggregate limits of the Travelers primary policy within the July 1, 1975 to July 1, 1976 Travelers primary policy period as opposed to the September 17, 1975 to July 1, 1976 First State umbrella policy period. They further argued that "Condition N," relied upon by First State as clearly establishing the period during which its obligations arose, was at best ambiguous and therefore, should be strictly construed against First State.
 
 
 8
 In contrast, First State argued that Condition N of its policy was not ambiguous and clearly required exhaustion of the underlying limits during the effective dates of its policy. Alternatively, First State argued, assuming arguendo, that the policy language was ambiguous, questions of fact with regard to the intent of the parties precluded summary judgment. Specifically, First State argued that the general rule advising that contract ambiguities be resolved against the insurer is inapplicable where, as here, the parties are of equal sophistication and bargaining power. In addition, First State maintained that numerous losses listed by Travelers as falling within the policy year July 1, 1975 to July 1, 1976 were improperly included.
 
 
 9
 The district court (1) rejected First State's interpretation of its insurance policy and (2) refused to reach the issue concerning the disputed losses. On subsequent motion the court, over the objection of First State, applied the law of New Jersey as opposed to Pennsylvania, and awarded both Certain-Teed and Travelers counsel fees against First State. On appeal, First State renews its contentions raised in the declaratory judgment action. First State further contests the choice of law applied by the district court in awarding attorney's fees to Certain-Teed and Travelers.
 
 II.
 
 10
 We turn first to the question of the proper construction of the First State umbrella policy. Certain-Teed and Travelers argued before the district court that the First State umbrella policy, which was to absorb Certain-Teed's excess losses upon the exhaustion of Certain-Teed's primary policy with Travelers, was triggered once the Travelers primary policy's $1,000,000 aggregate limit was exhausted regardless of whether the underlying losses occurred during the First State policy period. According to Certain-Teed and Travelers, the First State umbrella policy was concurrent with the terms and conditions of the Travelers primary policy. The district court granted summary judgment to Certain-Teed and Travelers holding that "Condition N" of the First State umbrella policy was ambiguous and would be strictly construed against First State as the author of the policy. Because we find that the district court erred in its construction of the First State insurance policy, we will reverse.
 
 A.
 
 11
 On review of the award of summary judgment we must apply the same test the district court should have employed in ruling on the motion. See Gans v. Mundy, 762 F.2d 338, 340 (3d Cir.1985) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). Moreover, we must determine whether the district court "properly concluded that 'no genuine issue as to a material fact remain[ed] for trial, and that the moving party [was] entitled to judgment as a matter of law.' " Id.
 
 
 12
 As a preliminary matter, the trial court is charged with the responsibility to determine "as a matter of law which category written contract terms fall into--clear or ambiguous." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980). In Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co., 632 F.2d 1068 (3d Cir.1980), this court summarized the rules governing the analysis of insurance contracts in Pennsylvania.
 
 
 13
 [T]he court's duty is to ascertain the intent of the parties as manifested in the language of the agreement. The court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits. A court should not torture the language of the policy in order to create ambiguities. If the language is unambiguous, interpretation of the contract is a matter of law for the court. If an ambiguity does exist and if the insurer wrote the policy or is in a stronger bargaining position than the insured, the ambiguity is generally resolved in favor of the insured and against the insurer. However, the principle that ambiguities in policies should be strictly construed against the insurer does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy.
 
 
 14
 Id. at 1075 (citations omitted). Guided by these principles we turn to the insurance policies here at issue.
 
 
 15
 All parties to the instant dispute point to specific language in the First State policy as clearly establishing the parameters of First State's obligations to Certain-Teed. Travelers asserts that the "Retained Limit--Limit of Liability"[2] of the First State Insuring Agreement affirmatively and unconditionally "obligates First State to undertake coverage in the event of the reduction or exhaustion of the aggregate of the underlying policy" without regard to the period in which the reduction or exhaustion occurs. Brief for Defendant-Appellee Travelers Insurance Company at 17. Similarly, Certain-Teed interprets the "Retained Limit" provision as obligating First State to "either pay the excess of a reduced underlying limit or continue in force as underlying insurance upon the reduction or exhaustion of the limits of liability of the underlying primary policy by reason of 'losses paid thereunder.' " Brief for Defendant-Appellee, Certain-Teed Products Corp. at 22-23. First State's position throughout the course of this litigation has been that Condition N, not the "Retained Limit" provision of its policy, firmly establishes its duty to Certain-Teed. Moreover, First State argues that reading the Retained Limit provision in conjunction with Condition N reinforces its argument that exhaustion of the underlying policy must occur during the First State policy period.
 
 
 16
 An insurance policy should be viewed in its entirety so as to give effect to all portions of the contract. See Treasure Craft Jewelers, Inc. v. Jefferson Ins., Co. of N.Y., 583 F.2d 650, 652 (3d Cir.1978). A policy provision is ambiguous only if reasonably intelligent people who consider it in the context of the entire policy would honestly differ as to its meaning. See Adelman v. State Farm Mut. Auto Ins. Co., 255 Pa.Super. 116, 386 A.2d 535, 538 (1978). Condition N--Maintenance of Underlying Insurance--of the First State policy provides:
 
 
 17
 It is warranted by the Insured that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of occurrences happening during the policy period. In the event of failure by the insured so to maintain such policy(ies) in force, the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.
 
 
 18
 See App. at 242a. Here, the district court was not persuaded that Condition N fixed the obligations and liabilities of First State with clarity. The court stated:
 
 
 19
 Condition N of the First State policy is ambiguous. The use of 'this' policy certainly refers to First State's excess policy. However, what the term 'the policy period' later in the clause refers to is far from clear. In an arrangement where three different insurance policies are in effect encompassing three different policy periods and two different insurance companies, the term 'the policy period' could refer to either First State's or Travelers' policy periods, at least on the face of the language alone.
 
 
 20
 App. at 676a-677a.
 
 
 21
 The district court reasoned that First State could have "easily clarified th[e] crucial clause" of Condition N by employing "similar phraseology which has been used in other insurance contracts." App. at 677a. In determining whether a policy or provision thereof is ambiguous, however, the question is not whether more lucid language could have been employed but, rather, whether the language actually employed would have created confusion in the mind of the reasonably intelligent contracting party. Although the court may properly consider whether alternative phrasing would have averted the confusion, the central inquiry must be whether the complaining party was reasonably misled by the language chosen. The mere fact that the parties do not agree upon the proper construction, however, will not render the language ambiguous.
 
 B.
 
 22
 After carefully reviewing the record we find that First State's umbrella policy, read as a whole, was clearly designed to provide excess coverage to Certain-Teed only after Certain-Teed had sustained a minimum of $1,000,000 in aggregate losses within the First State policy period. As noted by First State, an excess policy is excess because it has underlying limits. To allow losses occurring prior to the effective date of the First State policy to reduce that policy's required underlying limits would render those limits illusory and obligate First State to provide greater coverage than it bargained for. Nor does the Retained Limit provision of the First State policy suggest otherwise. That provision merely sets forth the retained limit which must be exhausted prior to the inception of First State's excess coverage. As the language of that provision makes clear, the retained limit is not necessarily the actual limits of any underlying policy; instead, the retained limit is an "amount equal to the limits of liability" required by the excess policy, here $1,000,000.[3] Notwithstanding Travelers's and Certain-Teed's assertion to the contrary, the Retained Limit provision of the First State policy does not address the issue of the time period during which the required losses must be sustained. It merely provides that those losses exceed the $1,000,000 aggregate limit.
 
 
 23
 Condition N, on the other hand, squarely addresses the question of when the required losses must occur. The insured is required to maintain underlying insurance sufficient to absorb losses--equal to the limits of liability--sustained within the First State policy period. Thus, "the underlying policy ... shall be maintained in force during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of occurrences happening during the policy period." App. at 135a. We agree with First State that the use of the phrase "during the policy period" in the same paragraph as the phrase "this policy" does not create an ambiguity. If, as the district court observed, "the policy period" were construed to mean the Travelers primary policy period, Condition N would simply require the obvious--that Travelers pay claims occurring during its policy period. Read in this way, Condition N would impose no restrictions on the impairment of the underlying limits and provide absolutely no protection to the excess carrier.
 
 
 24
 Moreover, throughout the excess policy, the First State policy period is consistently referred to as "the policy period."[4] The consistency in the meaning of "the policy" wording is particularly apparent in the use of the singular and plural designations in both "Condition N, Maintenance of Underlying Insurance" and provision "II Retained Limit--Limit of Liability." It must be observed that both of these excerpts are from language which can be used in a number of underwriting situations. The form is designed to be used whether the underlying insurance consists of one policy (as is the case here with Travelers's primary policy) or with more than one.
 
 
 25
 In every instance when reference is made to the underlying insurance, it is in the form of "policy(ies)." Similarly, when a reference is made to the aggregate amount of coverage in the underlying policy, "limit(s)" is used.
 
 
 26
 When this analysis is applied to Condition N, there is not the slightest ambiguity in its terms. The use of "policy(ies)" or "limit(s)" refers to the Travelers's underlying primary policy. Whenever N refers to "this policy" or "the policy period" in the singular, it is the First State contract that is identified. Thus, Condition N provides that the Travelers's primary policy shall remain in effect during the currency of the First State policy, except for any reduction of the Travelers's limits caused by payments for occurrences happening during the period of First State's policy. We are convinced that the language of Condition N read in the context of the entire policy is not ambiguous. We so hold.[5]
 
 III.
 
 27
 First State also argues that numerous losses listed by Travelers as falling within its policy year of July 1, 1975 to July 1, 1976 did not properly belong within that policy year. Specifically, First State challenged the inclusion of "Dual 80" claims which arose out of a defective roofing material placed on the market by Certain-Teed in 1969. The defective material blistered, causing severe roof leakage. It is First State's position that the Dual 80 claims all arose out of a single occurrence long before the inception of the First State policy. Even if the losses were considered separate occurrences, however, First State independently challenges Travelers's assignment of the loss dates on the basis of the date of installation rather than the date of damage. First State also challenges the propriety of approximately $132,389 in purported 1975-76 losses, designated the "small losses." These losses arose out of a dispute between Certain-Teed and Travelers beginning in late 1978 in which Certain-Teed claimed it had paid more than $1,000,000 in claims four to eight years earlier that it had neglected to report to Travelers. Travelers ultimately settled the dispute by off-setting a percentage of the claims against some of Certain-Teed's premiums due over a number of years.
 
 
 28
 First State maintains that a genuine issue of fact was presented as to whether and to what extent the Dual 80 and small losses could be assigned to the policy year 1975-76. The district court held that First State had failed sufficiently to raise the loss inclusion dispute in its pleadings and therefore refused to consider it. However, First States' complaint at paragraph 19 alleges:
 
 
 29
 many of the claims and/or losses which CERTAIN-TEED and TRAVELERS assert arose out of occurrences during the [First State policy period] ... in fact, arose out of occurrences prior to the effective date of the FIRST STATE Umbrella Policy.
 
 
 30
 App. at 12a. "Pleadings need do little more than indicate generally the type of litigation that is involved so that both plaintiff and defendant may have fair notice of the claim and its defense." 6 J. Moore, Federal Practice, pounds sterling 56.02, 56-26 (2d ed.1986). See also Starks v. Perloff Bros., 760 F.2d 52, 55 (3d Cir.1985) ("An overly restrictive reading of a complaint is inconsistent with the mandate that 'pleadings shall be so construed as to do substantial justice.' "). We think that First State's allegation satisfied this standard.[6] Consequently, the foregoing claims will be remanded to the district court for disposition not inconsistent with this opinion.
 
 IV.
 A.
 
 31
 Pursuant to New Jersey Court Rule 4:42-9(a)(6),[7] which allows for attorney's fees in favor of a successful claimant upon a liability or indemnity insurance policy, the district court found First State liable to Travelers and Certain-Teed for their attorney's fees in the amounts of $37,219.20 and $28,793.72 respectively. See App. at 686a, 688a. Because we will reverse the district court's order granting summary judgment against First State, Travelers and Certain-Teed no longer qualify as "successful claimant[s]." We nevertheless reach the choice of law issue raised by First State because of the substantial possibility of its recurrence on remand.
 
 
 32
 In considering the question whether to apply Pennsylvania or New Jersey law to the issue of attorney's fees, the district court concluded that a court rule relating to counsel fees is a hybrid of procedural and substantive law. App. at 791a-792a. In view of the hybrid nature of this rule and, more significantly, because of the policy considerations underlying its adoption, the district court concluded that New Jersey law should apply to the counsel fee issue "even though Pennsylvania law was rightly applied on the more substantive contractual issues involved in this case." App. at 792a.
 
 
 33
 We find that the district court erred as a matter of law in (1) applying New Jersey law to the issue of counsel fees and (2) awarding those fees to Travelers and Certain-Teed. The district court's hybrid rationale is untenable; there is simply no case law to support the proposition that, while some issues raised in a diversity action to resolve the rights and liabilities of parties under an insurance policy are subject to the substantive law of one state, the counsel fee issue may be properly decided on the basis of the procedural law of another state. Thus, it is the law of Pennsylvania, and not New Jersey, that governs the award of attorney's fees in this case.
 
 B.
 
 34
 The time-honored rule of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) requires that a federal court sitting in diversity apply the substantive law of the forum state. This general rule embraces the application of choice of law principles. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the instant action, then, New Jersey choice of law principles were properly applied in determining that Pennsylvania law would govern the resolution of the substantive contract dispute.
 
 
 35
 The controversy in this case arises from the district court's determination that although Pennsylvania law applied to the "more substantive contractual issues," App. at 792a, New Jersey law, as embodied in court rule 4:42-9(a)(6), would be applied to resolve the attorney's fee dispute. The court apparently reasoned--noting the "hybrid" nature of the court rule--that the policy considerations underlying the promulgation of the state-created attorney's fee remedy were sufficiently important to compel its enforcement. Certain-Teed offers the decision in State Farm Mutual Automobile Ins. Co. v. Simmons Estate, 84 N.J. 28, 417 A.2d 488 (1980), as supportive of the district court's logic. Therein, the New Jersey Supreme Court noted that although in general the construction of an insurance policy should be governed by the law of the state where the policy was issued,
 
 
 36
 this choice-of-law rule should not be given control nor dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties in the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies effected by, and governmental interest in, the outcome of the controversy.
 
 
 37
 84 N.J. at 37, 417 A.2d 488.
 
 
 38
 According to Certain-Teed, the State Farm opinion "indicates a recognition of the diverse issues which could arise in an insurance coverage dispute as well as the fact that the choice of law analysis must be applied separately to each of those issues." Brief for Defendant-Appellee, Certain-Teed Products Corp. at 45.[8] Our reading of State Farm, however, reveals support only for the proposition that the forum state may look to the policy considerations of the competing states before adopting the general rule that the law of the state where the policy was issued controls. Thus, while State Farm authorizes deviation from the general choice-of-law rule in contract disputes, it does not speak to the question whether, having chosen the state law to be applied to the contract claims, the district court may thereafter apply the law of another state (here, the forum state of New Jersey) to the issue of attorney's fees. More specifically, Certain-Teed has offered, and our research has uncovered, no New Jersey case law that would suggest that the New Jersey courts would dissect First State's insurance claim and thereafter apply New Jersey law only to the attorney's fees aspect of the claim. We think that the New Jersey courts would consider New Jersey Court Rule 4:42-9(a)(6) as an integral part of its insurance law and apply that body of law to the dispute in toto or not at all. Particularly on the facts of this case, we deem it unwise to endorse an approach that would allow courts and counsel to ignore substantial differences in the laws of competing jurisdictions at the time the choice of law determination is made. Instead, a full comparison must be made at the outset to prevent the unfair post hoc applications of laws more advantageous to the party urging their application.
 
 
 39
 In Alyeska Pipeline Service v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court held that under the "American Rule," which provides that attorney's fees are not ordinarily recoverable by the prevailing litigant in federal litigation in the absence of statutory authorization, the Wilderness Society could not recover attorney's fees from the Alyeska Pipeline Service based on the "private attorney general" theory since only Congress, not the courts, may authorize such an exception to the American Rule. In addressing the situation presented when a federal court sits in an ordinary diversity case, Justice White, writing for the majority, indicated that
 
 
 40
 where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed. 6 J. Moore, Federal Practice p 54.77, pp. 1712-1713 (2d ed. 1974).
 
 
 41
 Id. at 259 n. 31, 95 S.Ct. at 1622 n. 31.
 
 
 42
 Similarly, this court in Montgomery Ward & Co. v. Pacific Indemnity Co., 557 F.2d 51 (3d Cir.1977), noted that "state rules concerning the award of attorneys' fees are to be applied in diversity cases whether these rules provide for an award or deny it...." Id. at 56. In that case, the insured, Montgomery Ward, brought a diversity action against the insurer, Pacific Indemnity, seeking a declaration that Pacific was required to defend and indemnify it in a pending products liability action. Following settlement of the products liability action, Pacific paid a portion of the settlement, costs and attorney's fees incurred by Montgomery Ward in defending that action but did not reimburse the insured for the attorney's fees it incurred in bringing the declaratory judgment action. Consequently, Montgomery Ward continued to prosecute the action solely to recover the attorney's fees incurred in bringing the declaratory judgment action. The district court entered a judgment awarding Montgomery Ward attorney's fees, and Pacific appealed. On appeal, this circuit examined Pennsylvania state law governing the awarding of attorney's fees and concluded that, in general, Pennsylvania courts disfavor attorney's fees awards and thus adhere to a close application of the American Rule. See Montgomery Ward, 577 F.2d at 58-59. Although the court there did not uncover any Pennsylvania cases which applied the "obdurate behavior" or "bad faith" exception to the American Rule in a declaratory judgment action involving contract, it did note some cases that suggested, at least by analogy, that if the Pennsylvania Supreme Court were to consider the issue, it would apply the "obdurate behavior" exception consistent with the broad outlines articulated in Corace v. Balint, 418 Pa. 262, 210 A.2d 882 (1965).[9] See Montgomery Ward, 557 F.2d at 59.
 
 
 43
 In Balint, the Pennsylvania Supreme Court vacated an award of attorney's fees with the statement that:
 
 
 44
 '... Over and over again we have decided there can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same ...', Smith v. Equitable Trust Co., 215 Pa. 413, 417, 64 A. 591, 592 (1906), or clear agreement by the parties, Fidelity Philadelphia Trust Company v. Philadelphia Transportation Company, 404 Pa. 541, 548, 173 A.2d 109, 113 (1961), or some other established exception, see Hempstead v. Meadville Theological School, 286 Pa. 493, 134 A. 103, 49 A.L.R. 1145 (1926).
 
 
 45
 Balint, 418 Pa. at 271-72, 210 A.2d at 887. Based on a survey of Pennsylvania state law, this court in Montgomery Ward thus held that, when strong public policy exists for a party to perform a duty imposed by law and it is not performed because of obdurate behavior or bad faith, the state courts will not hesitate to impose attorney's fees to insure that private rights are vindicated and to provide an additional incentive to protect the public policy aspects of the action. See Montgomery Ward, 557 F.2d at 59 n. 13. In light of Montgomery Ward, there can be little dispute that under Pennsylvania law counsel fees could be assessed against the losing party only if it were found to have acted in bad faith. See also 42 Pa.Cons.Stat.Ann. Sec. 2503 (Purdon).
 
 
 46
 In this case involving an insurance policy issued and performed in Pennsylvania where the district court has acknowledged that the law of Pennsylvania governed the insurance dispute, the law of that jurisdiction must also apply to the issue of attorney's fees. Having adopted the law of Pennsylvania as that governing the main contract dispute, the district court should have uniformly applied that state's law to the remaining issues that essentially arose from that dispute. The attempt to atomize the various claims by the parties and classify each as substantive or procedural overly burdens the choice of law determination. Indeed, the approach urged by Certain-Teed and adopted by the district court threatens the proper application of choice of law rules by authorizing courts to ignore essential differences of the laws of competing jurisdictions.
 
 
 47
 Whether categorized as primarily substantive or primarily procedural for purposes of conflicts analysis, the right to attorney's fees cannot be examined in a vacuum.[10] Rather, the body of law regarding the resolution of contract claims includes the right to attorney's fees and must be examined as a whole. Since Pennsylvania does not permit an award of attorney's fees unless there is a finding of bad faith, the district court's award of attorney's fees against the losing party in the underlying action absent such a finding cannot stand. Accordingly, we reverse the judgment of the district court as entered in its orders of May 7 and 9, 1985. The applicable state law with regard to the issue of attorney's fees is that of Pennsylvania. Neither Travelers nor Certain-Teed is entitled to recover its attorney's fees from First State on the present record.[11]
 
 
 48
 BECKER, Circuit Judge, dissenting.
 
 
 49
 I join in all but Part II.B of the majority opinion. I also agree with the majority's conclusion in Part II.B that the rule requiring construction of all ambiguities against an insurer should not apply in this case. Unlike the majority, however, I find the First State umbrella policy sufficiently ambiguous as to the excess claims accrual period to merit initial interpretation by the district court under normal principles of contract law. Accordingly, I would reverse and remand for a new trial at which the ambiguity could be resolved.
 
 
 50
 According to our analysis of Pennsylvania rules governing insurance contracts in Eastern Associated Coal v. Aetna Casualty & Surety Co., 632 F.2d 1068, 1075 (3d Cir.1980), the rule that contractual ambiguities should be construed against insurers "does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy." That is the situation here. Pennsylvania law, however, requires courts to rule whether language is clear or ambiguous because, if the language is clear, construction of the contract is a matter of law (subject to the plenary review of this court), while if the language is ambiguous, interpretation of the contract is a matter of fact for the trial court's determination in the first instance. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1010-11 & nn. 9-10 (3d Cir.1980).
 
 
 51
 The question in this case is whether the First State excess insurance coverage begins after $1,000,000 in losses had accrued from occurrences within the entire period of Certain-Teed's underlying insurance policy or from occurrences only within the period of the First State policy. The majority finds the answer to this question clear because of Condition N:
 
 
 52
 It is warranted by the Insured that the underlying policy(ies) listed in Schedule A [the Travelers primary policy], or replacements thereof not more restricted, shall be maintained in force during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein, by payment of claims in respect of occurrences happening during the policy period. In the event of failure by the Insured to maintain such policy(ies) in force, the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.
 
 
 53
 Noting that reductions in the aggregate limit(s) of the underlying policies can only be by payment of claims arising in "the policy period," the majority finds First State's interpretation of the contract clearly correct because it finds it clear that "the policy period" refers to the First State policy period. It does so for four reasons.
 
 
 54
 First, the majority suggests that if " 'the policy period' were construed to mean the Travelers' primary policy period, Condition N would simply require the obvious--that Travelers pay claims occurring during its policy period." I do not understand this reasoning. Interpreting "the policy period" to refer to the Travelers' policy does not deprive Condition N of meaning. The primary significance of Condition N, as indicated directly by its language, is the requirement that Certain-Teed "maintain[ ]" the primary policy listed in the attached schedule. Condition N also makes Certain-Teed responsible for claims if it fails to do so. Neither of these restrictions on Certain-Teed is sacrificed by defendants' interpretation of Condition N. Neither does Certain-Teed's position deprive the language following the word "except" of meaning. Consistent with Certain-Teed's position, this language could clarify the basic thrust of Condition N by noting that a policy with an aggregate limit is reduced in force as claims against that limit are paid. So construed, this language would differentiate this policy from a policy in which the holder has an obligation to keep its underlying coverage at $1,000,000 so that the excess coverage would apply only if the liability from a single event exceeded $1,000,000.
 
 
 55
 Second, the majority argues that defendants' interpretation of Condition N "would impose no restrictions on the impairment of the underlying limits and provide absolutely no protection to the excess carrier." This claim is also without merit. Even if commencement of umbrella coverage began upon exhaustion of the underlying limits of the Travelers' primary policy, First State would be obligated to respond directly only to those losses ensuing out of occurrences within the First State policy's September 17, 1975 to July 1, 1976 policy period. Hence, First State could have received the benefit of its bargain in the form of a limited policy exposure term. Furthermore, if First State had a copy of the Travelers' policy or knew its provisions--a matter the parties dispute--it would have known the exact, additional three month period in which the underlying coverage could have been exhausted. The interpretation claimed by defendants is obviously less advantageous than that claimed by First State, but if First State made a bad bargain, we cannot rewrite the contract to protect it. That is especially true considering that First State wrote this contract, and we must ask not only what First State intended but what the purchaser could reasonably interpret the policy to mean.
 
 
 56
 Third, the majority points out that the contract uses the phrase "the policy period" in many places, each time in reference to the First State policy. Although this evidence is significant, it cannot be conclusive because none of these examples use "the policy period" to distinguish between the First-State policy and other policies. Furthermore, this phrase was nowhere defined in the contract to refer specifically to the First State policy, nor was it used in caps, bold face, or with quotation marks, any of which uses would indicate a particular contractual definition.[1]
 
 
 57
 Fourth and finally, the majority notes that "the policy period" is in the singular although all other references to the underlying policy use both singular and plural, e.g., "policy(ies)." Obviously, Condition N could not refer to "the policy(ies) period" for that would be grammatically incorrect. Perhaps the majority means that Condition N could have referred to "the policy period(s)." This argument makes sense, but I do not believe it sufficient to render this contract "clear" as a matter of law because the phrase "the policy period" follows most closely to a reference to the underlying "policy(ies)" and plausibly refers to them. Furthermore, the contract nowhere else refers to the "policy period(s)," nor does it set out any convention in the use of singulars and plurals. In the absence of a defined convention, defendants' interpretation is a reasonable reading of this language.
 
 
 58
 In sum, the majority's decision relies primarily on Condition N, and I find some of its arguments reasonable. Unfortunately, although the majority's interpretation clarifies some mysteries in the language of Condition N, it creates others. These problems combine with other evidence in support of defendants' position to convince me that this contract is not clear.
 
 
 59
 The only command in Condition N mandates that Certain-Teed "maintain[]" the policy(ies) listed in Article A. The final sentence of Condition N even suggests that Certain-Teed was liable only "[i]n the event of failure by [Certain-Teed] to maintain such policy(ies) in force." Such language could reasonably suggest to a policyholder that it would be fully covered so long as it maintained its policies, and that is exactly what Certain-Teed did. According to the majority's interpretation, however, Condition N obligated Certain-Teed not just to maintain its Travelers' policy, but also to augment this policy so that claims paid in the first three months of its coverage would not be counted against its aggregate limit. Essentially, the majority has focused on an exception to the explicit obligation to "maintain" imposed by Condition N and has inferred from that an additional obligation in tension with the normal meaning of the word "maintain". Although this interpretation is reasonable in the context of the whole contract, considering its failure to refer specifically to the Travelers' contract, it is not unambiguous. Indeed, what does seem clear is that Condition N was drafted without proper attention paid to the possibility of different policy periods for underlying and umbrella policies.[2]
 
 
 60
 Defendants' interpretation of the contract also receives support from the section captioned "INSURING AGREEMENTS--Retained Limit." This section provides in part:
 
 
 61
 In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying policy(ies) listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limit(s) or (2) in the event of exhaustion, shall continue in force as underlying insurance. [emphasis supplied]
 
 
 62
 Use of the term "thereunder" can refer only to the underlying Travelers' primary policy. Thus, although this section does not specifically address the true period during which the required losses must be sustained--as the majority points out--it plausibly communicated to Certain-Teed that excess coverage would begin once the underlying coverage was exhausted by losses paid under its terms and dates.
 
 
 63
 The ambiguity of this contract is further illustrated by evidence of industry practice in the record. For example, Everett Nay, assistant secretary of First State's parent company, authored an article entitled "Aggregate Limits--An Excess Carrier's Point of View," in which he discussed the problems arising from underlying and excess policies which are not concurrent in their respective policy periods. Mr. Nay observed that:
 
 
 64
 Some excess or umbrella insurers knowingly entering a risk mid-term [as First State did herein] add by endorsement the stipulation that the underlying coverage must be exhausted by losses falling within its policy period.
 
 
 65
 Despite this awareness, First State's endorsement was not specific. By way of contrast two other policies included in this record are quite explicit. A Midland Insurance policy provided (137a):
 
 
 66
 If aggregate limits are specifically stated in Item 3 and 4 of the Declarations, this Policy will apply in excess of reduced underlying insurance provided such reduction in the underlying insurance is solely the result of accidents or occurrences happening after the inception date of this Policy.
 
 
 67
 And in a Stonewall policy, the insurer provided: "[I]n the event of reduction or exhaustion ... the company shall be liable ... provided such reduction or exhaustion is solely the result of occurrences happening after the inception of this policy." The evidence of such explicit references in other insurance policies is relevant to this case because their absence in this contract supports the reasonableness of defendants' interpretation.
 
 
 68
 The short of my position is that, while the majority's interpretation is reasonable, it is not the only reasonable interpretation of the policy. To interpret this contract properly requires factfinding. For example, the parties do not even agree on such essential facts as whether First State had a copy of Certain-Teed's underlying Travelers' policy before issuing this one. The case cries out for parol evidence of the parties' intent and understanding--something both parties tout in abundance in their briefs. See Northbrook Insurance Co. v. Kuljian Corp., 690 F.2d 368, 372 (3d Cir.1982) (under Pennsylvania law, when insurance policy is ambiguous, court may use extrinsic evidence to arrive at construction that seems reasonable); Mellon Bank, 619 F.2d at 1010 n. 9 (parol evidence permissible to interpret ambiguous contract). For example, defendants point to an intra-office memorandum by A.H. Gray, a First State claims supervisor involved with the Certain-Teed account, which indicated that the underlying limits of the Travelers' primary policy did not have to be exhausted during the policy period of the First State umbrella policy. On the other side, First State points to dealings between Certain-Teed's insurance manager Mr. Kutzler and the respective insurance companies, which it claims indicate Certain-Teed's knowledge of an insurance gap.[3] The factfinder could consider this and other evidence of the conduct and statements of the parties, hear evidence of trade usage, and perhaps receive expert testimony, all with a view to ascertaining the intention of the parties as to the scope of excess coverage.
 
 
 69
 This contract is sufficiently ambiguous to make its interpretation a question of fact. I would remand for a trial during the course of which evidence of the parties' intentions could be developed. I respectfully dissent.
 
 
 
 [1]
 In October 1983 Rollins, Burdick, Hunter, Company was joined as a defendant by order of the court. See App. at 4a, 90a. All claims and cross-claims against RBH were subsequently dismissed with prejudice and without costs. See App. at 685a
 
 
 [2]
 That provision provides in pertinent part:
 II. Retained Limit--Limit of Liability
 With respect to Coverage I(a), I(b), or I(c), or any combination thereof, the Company's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:
 (a) an amount equal to the limits of liability indicated beside underlying policy(ies) listed in Schedule A hereof, plus the applicable limit(s) of any other underlying insurance collectible by the Insured or
 * * *
 In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying policy(ies) listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limit(s) or (2) in the event of exhaustion, shall continue in force as underlying insurance. The Company's total limit of liability, in respect to (1) and (2) above only, shall not exceed the single limit any one occurrence stated in Item 3 of the Declarations on account of all occurrences happening during each annual period commencing with the effective or anniversary date of the policy.
 App. at 239a.
 
 
 [3]
 Under normal circumstances, where the terms of an insured's excess and primary policies are concurrent, the required retained limit will usually be at least equal to the actual limits of the underlying policy. Here, however, in an effort to minimize its excess policy premiums, Certain-Teed acquired only one primary policy (Travelers), underlying two separate $10,000,000 excess policies (Travelers and the First State/Stonewall package), where both excess policies required a full $1,000,000 underlying aggregate limit during the currency of their policies. This arrangement created a gap in Certain-Teed's coverage because losses sustained between July 1, 1975 to September 17, 1975--the time the Travelers excess policy was in effect--reduced the required $1,000,000 underlying limit of the First State policy prior to that policy's effective date
 
 
 [4]
 The First State policy characterizes the duration of its term as "the policy period" on several occasions:
 PREMIUM ... If the Policy Period is more than one year and the premium is to be paid in installments, premium is payable on ... App. at 131a (emphasis added).
 CORRECTED ENDORSEMENT # 1. In consideration of a return of premium of $35,096.00 it is hereby agreed that the policy period shall be: From September 17, 1975 To: July 1, 1976. App. at 133a (emphasis added).
 POLICY PERIOD, TERRITORY ... This policy applies only to occurrences happening anywhere in the world during the policy period, App. at 134a (emphasis added).
 OCCURRENCE ... shall mean an accident, including injurious exposure to conditions which results, during the policy period, in personal injury or property damage ... App. at 134a (emphasis added).
 PREMIUM COMPUTATION ... Upon termination of this policy the earned premium shall be computed ... The Named Insured shall maintain records ... and shall send copies of such records to the Company at the end of the policy period.... App. at 135a (emphasis added).
 
 
 [5]
 Were Condition N ambiguous, there is nonetheless overwhelming evidence on this record that indicates that the principle that ambiguities in policies be strictly construed against the insurer should not apply and that a genuine issue as to the intent of the parties existed, thereby precluding summary judgment. Under circumstances such as these, where sophisticated parties negotiate and execute an insurance contract--albeit on form paper,--additional evidence is necessary to ascertain the intent of the parties so as to avoid engrafting onto the policy terms to which the parties have not agreed
 
 
 [6]
 Indeed, on the motion for summary judgment the district court observed:
 "I could agree that reading the complaint to the broadest extent of notice pleading one might find in there allegations questioning dates attributed to occurrences by Travelers and/or Certain-Teed, or either of them, and, of course, Mr. Rosen has raised that in his papers and his argument here today."
 App. at 668a. We have long adhered to the general rule that pleadings should be liberally construed. See Richardson v. Pennsylvania Department of Health, 561 F.2d 489, 492 (3d Cir.1977).
 
 
 [7]
 N.J.Ct.R. 4:42-9(a)(6) provides, in pertinent part:
 (a) ... no fee for legal services shall be allowed in the taxed costs, or otherwise, except ... in an action upon a liability or indemnity policy of insurance, in favor of a successful claimant.
 (emphasis in original).
 
 
 [8]
 Certain-Teed also argues that having elected to commence this action in New Jersey, First State must now bear the burden of its decision, the implication being that First State must accept the application of New Jersey's court rule on the issue of attorney's fees. This argument, however, adds nothing to the resolution of the conflicts issue here in dispute. It is clear that once a litigant has initiated an action s/he is committed to the substantive laws of the forum state. Forum-shopping, however, may not undermine the proper application of choice of law principles. Thus, if Pennsylvania law--under any choice-of-law analysis--must govern the contract claims in this case, First State could not, simply by changing forums, change the applicable law
 
 
 [9]
 See, e.g., Bata v. Central-Penn National Bank of Philadelphia, 448 Pa. 355, 372 & n. 13, 293 A.2d 343, 352-53 & n. 13 (1972); Brocker v. Brocker, 429 Pa. 513, 520, 241 A.2d 336, 339 (1968)
 
 
 [10]
 The debate whether attorney's fees are substantive or procedural rages on. At least three members of the Supreme Court have concluded that "[t]he right to attorney's fees is 'substantive' under any reasonable definition of that term." Marek v. Chesny, 473 U.S. 1, 105 S.Ct. 3012, 3031, 87 L.Ed.2d 1 (1985) (Brennan, J. joined by Marshall and Blackmun, JJ., dissenting). For the purposes of the instant appeal, however, we need not address this issue
 
 
 [11]
 On the basis of our decision in Part II of this opinion, Travelers and Certain-Teed are no longer eligible to recover fees as prevailing parties. Had Travelers and Certain-Teed prevailed before this court on the merits of the summary judgment appeal, however, they would still not be entitled to attorney's fees under Pennsylvania law. In the course of determining the choice of law, the district court specifically found "that the defendant Certain-Teed ... [had not] established ... that the conduct of [First State] or the injection of other issues, or what have you, protracted [the litigation] in such a way as to indicate bad faith." App. at 789a-790a
 
 
 [1]
 Under the section "Definitions," there is a paragraph entitled "Policy Period, Territory," but this paragraph reads only: "This policy applies only to occurrences happening anywhere in the world during the policy period." In contrast, other terms in the definitions section are presented in quotations and defined with explicit meanings, e.g., "personal injury," "ultimate net loss," and "named insured."
 
 
 [2]
 Condition I makes this lack of attention quite clear. It provides:
 If underlying insurance applicable in any one occurrence is exhausted by payment of judgment or settlement on behalf of the Insured, the Company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the Insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another insurer.
 Exhaustion in this paragraph makes no mention of restricting claims to any policy period.
 
 
 [3]
 First State points to internal memoranda of Travelers referring to Kutzler as a "formidable and cunning adversary," whom Travelers feared and distrusted. First State argues that Kutzler's machinations support its position as to the meaning of the policy. First State claims that Kutzler knew of the gap in Certain-Teed's coverage and tried to cover that gap but failed because of an unwillingness to pay the price