J. Christopher ALSTRIN, Melvin Pearl Bruce Taylor, Jeffrey Taylor, and Sidney Taylor, Plaintiffs,

v.

ST. PAUL MERCURY INSURANCE COMPANY, Continental Casualty Company, Reliance Acceptance Group, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Lori Cole, Howard Silverman, William Race, Ross Mangano, Dean Griffith, Solway Firestone,, Reliance Insurance Company David T. Allen, not individually, but as the Estate Representative, Shirley Cole, not individually, but as the Independent Executor of the Estate of Irwin Cole, James Dolph, and Thomas Barlow, Defendants.

No. CIV.A. 98–683–RRM.

United States District Court, D. Delaware.

Jan. 16, 2002.

See also 135 F.Supp.2d 480.

Vernon Proctor, Esquire, The Bayard Firm, Wilmington, DE, for plaintiffs J. Christopher Alstrin, Bruce Taylor, Jeffrey Taylor, Sidney Taylor, and Melvin Pearl.

Jonah Orlofsky, Esquire, Law Officers of Jonah Orlofsky, Chicago IL, for plaintiffs Christopher Alstrin, Bruce Taylor, Jeffrey Taylor, and Sidney Taylor.

David Bradford, Esquire, David Sanders, Esquire, and David Layden, Esquire, Jenner & Block, Chicago, IL, for plaintiff Melvin Pearl.

Andre G. Bouchard, Esquire, Bouchard Margules & Friedlander, Wilmington, DE, David A. Boyar, Esquire and Michael McDermott, Esquire, D'Amato & Lynch, New York City, for defendant National Union Fire Ins. Co. of Pittsburgh, PA.

## MEMORANDUM OPINION

MCKELVIE, District Judge.

This is a dispute over directors and officers insurance coverage for liabilities in connection with a securities class action lawsuit and related bankruptcy adversary proceedings. The plaintiffs in this insurance coverage dispute, J. Christopher Alstrin, Melvin Pearl, Jeffrey Taylor, Bruce Taylor, and Sidney Taylor (collectively, "the D & O plaintiffs") are former officers and directors of the Cole Taylor Financial Group, Inc.. They are also among the defendants in a securities class action and in related adversary proceedings brought by the Estate Representative of the company, which is now a Chapter 11 Debtor. The D & O plaintiffs have asserted claims for directors and officers liability insurance ("D & O insurance") coverage against defendants, St. Paul Mercury Insurance Company ("St.Paul"), Continental Casualty Company ("Continental"), Reliance Insurance Company ("Reliance"), and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") under D & O insurance policies issued by those entities.

St. Paul issued a primary $10 million D & O insurance policy to the directors and officers of Cole Taylor Financial Group, Inc. that was in effect from July 31, 1996 through July 31, 1997. Continental and Reliance each issued $10 million excess policies above the St. Paul primary coverage to the Cole Taylor Financial Group. National Union issued an overlapping $30 million policy to the Cole Taylor Financial Group that was in effect from February 12, 1997 through February 12, 2003. The National Union policy provides separate D & O coverage for both the Cole Taylor Financial Group and the Reliance Acceptance Group. According to plaintiffs' counsel, tentative settlements have been reached with St. Paul, Continental, and Reliance. This opinion addresses certain defenses asserted by National Union to deny coverage for the claims interposed by the D & O plaintiffs.

The D & O plaintiffs seek summary judgment on Counts V and VI of their Second Amended Adversary Proceeding Complaint. Together, these counts seek a declaration that the claims asserted against the plaintiffs by both the shareholder class and the Estate Representative are covered by the National Union policy, and that the policy provides $30 million of excess insurance over any insurance monies collected from St. Paul, Continental, and Reliance. The D & O plaintiffs also seek summary judgment on Separate Defenses 6, 7, 8, 9, 10, 11, 12, and 13 of National Union's answer. Those affirmative defenses set forth the nine insurance policy exclusions that National Union relies upon to deny coverage.

This is the court's decision on plaintiffs' motion for partial summary judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. The Securities Class Action and Bankruptcy Adversary Proceedings

While the background and procedural history of the securities lawsuit is more comprehensively set forth in the court's two earlier opinions, *In re Reliance Sec. Litig.*, 91 F.Supp.2d 706 (D.Del.2000) (denying defendants' motions to dismiss plaintiffs' claims for breach of fiduciary duties and claims for securities fraud under §§ 10(b), 14(a), and 20(a) of the Exchange

Act) and *In re Reliance Sec. Litig.*, 135 F.Supp.2d 480 (D.Del.2001) (granting in part and denying in part certain defendant's motions for summary judgment), for the purposes of this opinion, the court will briefly review the facts necessary to give context to the insurance dispute that is the subject of this opinion.

The underlying securities litigation arose out of the corporate restructuring and subsequent bankruptcy of Reliance Acceptance Group, Inc. ("RAG") in 1997 and 1998. RAG is a Delaware corporation, and was formerly known as Cole Taylor Financial Group, Inc. ("CTFG"). The plaintiffs in the securities action (collectively, "the Graham Plaintiffs") are former shareholders of RAG. The defendants in the securities action (collectively, "the Graham Defendants") are former officers, directors, accountants, financial advisors, and subsidiaries of RAG, and other entities formed in the corporate restructuring.

In 1981, Irwin Cole and Sidney Taylor formed CTFG as a holding company for a group of commercial banking institutions. CTFG remained a private corporation until 1994 when the company made an initial public offering of its stock. The Cole and Taylor families remained CTFG's largest shareholders, each owning approximately 25% of the company's outstanding stock. By the early 1990s, Jeffrey Taylor, Bruce Taylor, and Sidney Taylor (collectively, the "Taylor Family") served respectively as the CTFG's CEO, President, and Chairman of the Executive Committee. By the time the events at issue occurred, both Irwin Cole and his daughter, Lori Cole, (collectively, the "Cole Family") were directors of CTFG, but had no day-to-day role in its operations. In 1997, at the time of the corporate restructuring, CTFG operated as a holding company for three wholly owned subsidiaries: Cole Taylor Bank, a regional commercial lender based in Chicago, Illinois, with a record of sustained profitability but slow growth; CT Mortgage Company, Inc., a mortgage company that provided subprime residential real estate loans; and Reliance Acceptance Corporation ("RAC"), a rapidly growing finance company specializing in subprime auto loans based in San Antonio, Texas.

RAC commenced operations in January 1993. It purchased and serviced sales finance contracts in connection with the sale of automobiles. Principally, RAC purchased subprime loans, loans in which the borrowers had substandard or nonexistent credit histories. RAC bought the loans at a discount from the car dealers. RAC implemented expedited procedures for authorizing loans, including a program to process loans within one hour. This program was popular with automobile dealers, who could arrange financing for a buyer before he or she left the parking lot. Under this program, RAC expanded its loan portfolio rapidly. From 1993 to 1996, RAC's gross finance receivables grew nearly twenty-fold, from $24.4 million to $429 million. Throughout this period of expansion, the CTFG's annual net income grew from $198,000 in 1993 to $9.6 million in 1995. CTFG's stock price rose from approximately $18 per share in 1995 to a high of approximately $31 in the Fall of 1996.

It was alleged in the securities lawsuit, however, that beneath this rosy growth story lay vast economic troubles. CTFG's Board of Directors allegedly received a 1995 report issued by the Federal Reserve Bank stating that RAC's loan portfolio was deteriorating. The Federal Reserve Bank reported that it had reviewed five of RAC's branch offices, rating four of them "marginal" and the fifth "unsatisfactory." The report disclosed, moreover, that RAC had an approximately 83% staff turnover annually. CTFG's directors also allegedly

received a December 1995 internal audit report that two-thirds of RAC's 36 branch offices were underwriting loans based on incomplete and inaccurate credit investigations. A July 1996 internal report revealed that 55% of RAC's branches were failing to properly investigate credit applications. According to the Graham Plaintiffs, the loss rate for RAC's loans increased annually, from 4.5% in 1993 to 25.3% in 1996. During this same time period, the Graham Plaintiffs allege, RAC's loan loss reserves dropped from 6.18% of its total loans in 1993 to 4.08% by 1996. According to the allegations in the class action complaint, during this period CTFG issued a series of allegedly false and misleading financial statements which inflated the assets and earnings of its subsidiary, RAC, by understating the reserves needed to properly account for uncollectible loans.

On February 12, 1997, after a vote of the shareholders, CTFG spun off Cole Taylor Bank and CT Mortgage Company and retained control of RAC. This transaction is referred to by the parties as "the split-off transaction." As a result of this transaction, the class plaintiffs allege, the Taylor defendants took the valuable Cole Taylor Bank and Mortgage Company private, leaving the CTFG shareholders with ownership of the virtually worthless subprime auto loan subsidiary, RAC. Two days later, CTFG, which amended its Certificate of Incorporation to change its name to RAG after the close of the split-off transaction, issued a press release announcing that "it would make significant provisions for credit losses for the fourth quarter of 1996." On February 9, 1998, less than a year later, after a string of announcements revealing escalating losses and worsening financial distress, RAG filed for a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of Delaware.

Beginning in January 1998, shareholders of RAG filed a number of class action lawsuits in the Western District of Texas and the Northern District of Illinois against officers, directors, accountants, financial advisors, and subsidiaries of CTFG, and other entities formed in the split-off transaction, alleging violations of §§ 10(b), 14(a), 20(a) of the Securities Exchange Act of 1934, as well as various state law claims.

On September 4, 1998, David Allen, the Estate Representative of the Chapter 11 estate of RAG and its subsidiaries, filed two adversary proceedings in the United States Bankruptcy Court for the District of Delaware against many of the defendants named in the securities case. The Estate Representative asserts state law fraudulent transfer claims, fiduciary duty claims, professional malpractice claims, and other related common law claims. On July 15, 1999, after this court granted motions to withdraw the reference from the Bankruptcy Court and to consolidate the cases, these adversary proceedings were consolidated in the United States District Court for the District of Delaware. The consolidated adversary proceedings are presently captioned *Allen v. Taylor*, et. al., C.A. No. 99–146–RRM.

On December 9, 1999, the Judicial Panel on Multidistrict Litigation transferred the Texas and Illinois class action lawsuits to this court to consolidate discovery and other pre-trial matters with the adversary proceedings in the bankruptcy. The consolidated securities class action is presently captioned *Graham et al. v. Taylor Capital Group et al. (In re Reliance Sec. Litig.)*, C.A. No. 99–858–RRM.

On October 12, 2001, after a series of mediation sessions with Magistrate Judge Thynge, a large number of the parties involved in the securities litigation and

bankruptcy adversary proceedings announced that they had agreed to a Stipulation of Settlement By and Among The Class, The Estate Parties, The Graham Defendants, The Cole Family, and The Taylor Defendants. The Stipulation of Settlement settles the claims of the Class against the defendants and other parties thereto. It also (i) resolves all competing claims of the settling defendants, the RAG bankruptcy estate, and the shareholder class to the limited funds available under the D & O liability insurance policies, and (ii) gives the shareholder class the right to receive payments of up to approximately $28 million of proceeds potentially recoverable under said insurance policies and to additional potential recoveries arising in tort with respect to those policies. Approval of the Stipulation of Settlement and dismissal of the Taylor family defendants from the class action case is a precondition to the effectiveness of a separate agreement between the Taylor defendants and the bankruptcy estate, which requires the Taylors to deliver $15 million in cash, $30 million face value of trust preferred securities, and 15% of the outstanding common stock of Taylor Capital Group, Inc. to the estate for further distribution under RAG's chapter 11 reorganization plan. The Settlement Stipulation authorizes the allowance of the proof of claim filed on behalf of the shareholder class in RAG's chapter 11 bankruptcy case in the amount of $58 million. Under RAG's reorganization plan, the Class would share with certain other parties between approximately $27 and $40 million in the aggregate cash and securities.

Pursuant to a subsequent motion to approve the partial settlement, on November 13, 2001, the court granted preliminary approval of the settlement. On December 3, 2001, the parties also agreed to a separate Stipulation of Settlement with defendant, KPMG LLP.

B. *The Insurance Coverage Proceedings Involving D & O Plaintiffs and National Union*

On May 29, 1998, plaintiffs, J. Christopher Alstrin, Adelyn Dougherty, Melvin Pearl, Bruce Taylor, Jeffrey Taylor, Sidney Taylor, and Richard Tinberg, all former officers and/or directors of the Debtor, RAG, filed the complaint in this action in the Bankruptcy Court for the District of Delaware. On July 27, 1999, this court withdrew the reference of the case to the bankruptcy court. On April 14, 2000, plaintiffs amended their complaint, naming National Union as a co-defendant along with St. Paul, Continental, and Reliance, and adding two additional counts. Plaintiffs seek a declaration of their contractual rights as insureds under certain directors and officers insurance policies purchased by the RAG from St. Paul, Continental, Reliance, and National Union.[1]

In their first amended complaint, plaintiffs contend that: 1) the proceeds from the four D & O policies issued by St. Paul, Continental, Reliance, and National Union belong to themselves rather than to the RAG Chapter 11 estate; 2) the policies' Insured versus Insured clauses are not triggered by suits between themselves and the RAG Estate Representative; 3) timely notice of potential litigation was given as required by three of the policies; 4) no other exclusions bar recovery under the St. Paul policy; and 5) plaintiffs are entitled to coverage under the National Union policy in the event that they are not covered by the other three. With respect to

---

**1.** This insurance coverage dispute is captioned *Alstrin et al. v. St. Paul Insurance et al.,* C.A. No. 98–683–RRM.

the National Union policy, the D & O plaintiffs seek coverage for the claims asserted against them under endorsement 17. Endorsement 17 provides "Run–Off Coverage" for claims asserted during the policy period based on wrongful acts committed on or before February 12, 1997, the date the split-off transaction closed.

National Union's time to answer or otherwise respond to the amended complaint was extended to June 16, 2000. On that date, National Union filed a motion to dismiss or, in the alternative, to stay the action and compel arbitration of the claims relating to National Union. The basis of National Union's motion was endorsement No. 16 to the National Union policy, which requires the arbitration of disputes relating to the policy. National Union's motion was opposed by the plaintiffs and by the Estate Representative, who contended that the claims against National Union should remain in the case and not be arbitrated because: 1) they are "core" to the bankruptcy proceeding; and, 2) requiring arbitration against one of the defendants and adjudication against the remainder would conflict with the underlying purposes of the Bankruptcy Code. At a subsequent oral argument before the court, National Union withdrew its motion.

On October 13, 2000, the plaintiffs filed a motion requesting leave to file a second amended adversary proceeding complaint. National Union opposed the motion. On April 30, 2001, the court granted plaintiffs leave to file their proposed second amended adversary complaint. Plaintiffs filed their second amended complaint on May 16, 2001. In the second amended complaint, formerly named plaintiffs Adelyn

Dougherty and Richard Tinsberg were removed, leaving only the D & O plaintiffs. Moreover, the allegations regarding plaintiffs' claims against National Union were expanded and set forth in greater detail. On May 25, 2001, National Union filed its answer. National Union's answer contains numerous affirmative defenses based upon policy exclusions as well as counterclaims for rescission based upon, among other things, misrepresentation in the application that was submitted to National Union.[2]

On July 11, 2001, the D & O plaintiffs moved for partial summary judgment on the defenses asserted by National Union based on nine policy based exclusions. It is undisputed that the D & O plaintiffs are seeking coverage under endorsement 17 of the National Union policy, which the parties refer to as the "Run–Off Coverage." Plaintiffs contend that first five exclusions contained in the first sixteen endorsements on the National Union do not apply to bar the coverage sought because the first sixteen endorsements do not apply to the separate Run–Off Coverage in endorsement 17. Plaintiffs alternatively argue that even if the court finds that these exclusions do apply to endorsement 17, the plain language of the asserted exclusions demonstrates that they do not apply to claims for which the coverage is sought. Last, plaintiffs present both substantive and estoppel-based reasons for why the remaining four exclusions, contained in section four of the policy, are also not applicable to deny coverage.

National Union filed its answering brief in opposition to the D & O plaintiffs motion on September 10, 2001. In its brief,

**2.** National Union's counterclaims for rescission are the subject of a subsequent summary judgment motion filed by National Union on January 9, 2002 (D.I.337), which has not been fully briefed, and is therefore not addressed in this opinion. This opinion will address only the D & O plaintiffs' summary judgment motion, which relates to defenses raised by National Union that are based upon policy exclusions and endorsements.

National Union contends that the nine exclusions are applicable to deny the coverage sought by the D & O plaintiffs. National Union argues that all of the exclusions contained in the first sixteen endorsements apply to the Run–Off Coverage in endorsement 17 unless otherwise amended not to apply and that each of the policy based exclusions that it listed in its answer are applicable to deny coverage in this case.

On November 14, 2001, after the D & O plaintiffs concluded the briefing on their motion by filing their reply brief on November 2, 2001, the court heard oral argument on their motion for partial summary judgment. This is the court's decision on their motion.

## II. STATEMENT OF FACTS

### A. Claims for Which Coverage Is Sought

The D & O plaintiffs seek coverage from National Union under the D & O insurance policy for two groups of claims. First, they seek coverage for liabilities arising from the consolidated shareholder class actions brought before this court that principally assert violations of the federal securities laws. Second, plaintiffs seek coverage for the liabilities arising from the claims filed by the Estate Representative in the two adversary proceedings that have also been consolidated before this court. These lawsuits assert claims for fraudulent conveyance and breach of fiduciary duty.

### B. The National Union Policy

This section will briefly review the structure and relevant exclusions and endorsements contained in the National Union policy.

### 1. The Structure of the National Union Policy

The National Union Policy, policy number 484–93–25, was issued by National Union to RAG and is comprised of a two-page declarations section, the pre-printed policy form, and a number of manuscript endorsements. The policy provides for D & O insurance, stating, in relevant part, that National Union will:

> pay the Loss of each and every Director or Officer of the Company arising from a Claim first made against the Directors or Officers during the Policy Period ... for any actual or alleged Wrongful Act in their respective capacities as Directors or Officers of the Company ....

The parties agree that although the National Union Policy is one document, two separate lines of coverage are provided for therein. The main body of the policy provides coverage for the directors and officers of RAG, effective February 12, 1997, for acts committed on or after February 12. As noted above, RAG is the post-split-off finance company.[3] This policy is referred to as the "going forward coverage" for the reorganized finance company. The policy also provides coverage for the officers and directors of the pre-split-off CTFG for claims asserted on or after February 12, but based on acts committed on or before February 12. This coverage, which is provided in endorsement 17, is referred to as the "Run–Off Coverage."

Although combined in one document, the going forward and the Run–Off lines of coverage provided for within the policy are

---

**3.** While it has been noted that CTFG was renamed RAG as a result of the split-off transaction, it should be noted that the entities are distinct from a D & O insurance standpoint because they had different officers and directors. The CTFG officers and directors separated into two groups after the split-off, with some staying with RAG and others going to the Taylor Capital Group.

distinct in a number of ways. They are issued to different companies—the going forward coverage names RAG as the insured, while the Run–Off Coverage names CTFG as the insured. The two lines of coverage have different policy periods—one year for the going forward coverage and six years for the Run–Off Coverage. Finally, National Union specified separate premiums for the two lines of coverage. The going forward coverage cost $500,000 while the Run–Off Coverage cost $900,000.

The National Union Policy went into effect on February 12, 1997, the day the split-off transaction closed. At that time, CTFG already had a $30 million D & O coverage program that was set to expire on July 31, 1997. The existing program consisted of three policies: a $10 million St. Paul primary policy, a $10 million Continental first layer excess policy, and a $10 million Reliance second layer excess policy (collectively "the St. Paul Program"). The National Union policy and the St. Paul Program overlapped for approximately 5 ½ months from February to July. The parties intended the National Union policy to provide excess coverage over the St. Paul Program during the overlap period. In response to questions raised by one of the attorney's for the Taylors about the coverage National Union was providing, National Union's representative Joe Casey, explained in a fax memorandum that:

> ... the [National Union D & O insurance ]policy will provide run-off coverage (for Wrongful Acts committed prior to 2/12/1997) for a period of 6 years, and the coverage provided by this endorsement, will also be [in] excess of the St. Paul led program.

2. *The Pertinent Provisions of the National Union Policy*

   a. *Policy Form Exclusions*

The insurance policy pre-printed form contains, in Section 4, four exclusions that are relevant to the parties' coverage dispute. These exclusions are:

- Exclusion 4(a)—Illegal profit or advantage
- Exclusion 4(c)—Criminal or deliberate fraudulent act
- Exclusion 4(d)—Claims noticed under a prior policy
- Exclusion 4(i)—Insured v. Insured

Exclusion 4(a) excludes claims "arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an insured was not legally entitled." Exclusion 4(c) excludes claims "arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraud." Exclusion 4(d) excludes from coverage insurance claims "alleging [or] arising out of ... any claim which has been reported, or in any circumstances of which notice has been given ... under any policy of which this policy is a renewal or replacement or which it may succeed in time." Exclusion 4(i) excludes from coverage any claim made against an Insured "which is brought by any Insured or by the Company ...."

   b. *The Policy Endorsements*

Each of the endorsements to the National Union policy states at the beginning thereof that it forms "a part of policy no. 484–93–25." Each of the endorsements modifies either the declaration section, the policy form, or other endorsements. Thus, the insurance contract consists of the standard policy form as customized by the endorsements. The endorsements include:

- Endorsement 1: "Texas Liability Insurance Amendatory Endorsement Cancellation and Nonrenewal." This endorsement replaces the cancellation provisions of the policy form.

- Endorsement 2: "Nuclear Energy Liability Exclusion Endorsement." This endorsement excludes from coverage matters relating to nuclear facilities/materials.
- Endorsement 3: "Texas Amendatory Broad Form Nuclear Energy Liability Exclusion Definition of Waste." This endorsement amends endorsement 2.
- Endorsement 4: "Securities Claims Coinsurance Clause." This endorsement amends the Insuring Agreement provision of the policy form by adding a coinsurance provision for securities claims.
- Endorsement 5: "Prior Acts Exclusion." This endorsement amends the Insuring Agreement provision of the policy form by excluding from coverage claims based upon wrongful acts occurring prior to February 12, 1997 and provides that losses arising out of the same or related "Wrongful Act(s)" shall be deemed to arise from the first such same or related Wrongful Act.
- Endorsement 6: "Amend Not–For–Profit ODL Extension For 501(c)(6)." This endorsement amends the Definition (i) provision of the policy form.
- Endorsement 7: "Outside Entity Endorsement." This endorsement amends endorsement 6.
- Endorsement 8: "Professional Services E & O Exclusion." This endorsement excludes from coverage claims relating to professional services involving warehousing, securitizing, or servicing loans for others.
- Endorsement 9: "Divestiture Exclusion." This endorsement excludes from coverage claims relating to the "divestiture, sale, or disposition of [CTFG] and its subsidiaries or the transfer of [CTFG] shares or the cash equivalent of the transfer of [CTFG] shares from [CTFG] to the Named Insured."
- Endorsement 10: "The Family Exclusion." This endorsement excludes from coverage claims brought by members of the Cole or Taylor families.
- Endorsement 11: "Secondary Public Offering Exclusion." This endorsement excludes from coverage claims relating to the purchase or sale of a security in a secondary public offering.
- Endorsement 12: "Cross-claim Exclusion." This endorsement excludes from coverage claims arising out of wrongful acts committed by CTFG, Piper Jaffray, Coopers & Lybrand, and KPMG or any claims brought by these entities.
- Endorsement 13: "AIG Non–Stacking of Limits Endorsement." This endorsement reduces the limit of liability by the limit of liability provided under any other AIG policy.
- Endorsement 14: "Bank E & O Exclusion." This endorsement excludes from coverage claims arising out of certain professional services.
- Endorsement 15: "Amend Exclusion (d)—Specific Notice of Claims." This endorsement amends exclusion 4(d) of the policy form and provides that there will be coverage in the event that there is a final adjudication that no coverage exists under the St. Paul policy solely due the such claim not fulfilling the requirements of Section 7 of the St. Paul policy. Section 7 of the St. Paul policy addresses the coverage for claims made after the policy period but arising from claims or notices given to St. Paul prior to the expiration of the St. Paul policy period.
- Endorsement 16: "Securities Plus Endorsement." This endorsement

amends various provisions in the definition section of the policy form as well as exclusions (f), (i), and the Retention, Defense Costs, Settlements and Judgments, and Arbitration provisions of the policy form.

- Endorsement 17: "Cole Taylor Financial Group, Inc. Run–Off Endorsement." This endorsement, which creates the Run–Off Coverage for CTFG, will be described in greater detail below. This endorsement covers any "Wrongful Act" committed by the officers and directors of CTFG. "Wrongful Act" is defined as anything an officer or director does that arises out of their serving as a director or officer of CTFG.

- Endorsement 18: This provision amends two provisions of endorsement 17. Of particular importance is that the Insuring Agreement "was amended to change all references of 'occurring prior to February 12, 1997' to now read 'occurring on or prior to February 12, 1997.'"

Endorsement 17, the Run–Off endorsement, is comprised of three parts: an introduction, internal endorsement sections I through XI, and a conclusion, which states that "all other terms, conditions, and exclusions shall remain unchanged." The introduction states that, like all the other endorsements, "[t]his endorsement ... forms a part of policy number 484–93–25." The next paragraph of the introduction states:

> In consideration of the premium charged, it is hereby understood and agreed that "run-off" coverage shall be provided to Cole Taylor Financial Group, Inc. ("Cole Taylor"). It is fur-

ther understood and agreed that solely with respect to the run-off coverage provided to Cole Taylor, the following amendments shall apply to the policy to which this endorsement attaches.

The run-off endorsement, therefore, takes the policy issued to RAG and creates the Run–Off Coverage for CTFG by amending the policy in the manner set forth in the endorsement.

Following the above quoted prefatory statement, endorsement 17 is divided into sections I through XI. Sections I through X each modify various sections of the policy form by referring to a section of the main body of the policy and then amending that section. In contrast, Section XI, the last section of the run-off endorsement, states that "[f]or the purposes of this endorsement only, the following shall apply."[4] This statement is followed by a list of eight clauses, which the D & O plaintiffs characterize as internal endorsements for the Run–Off Coverage. The clauses include provisions for, amongst other things, adding a "Securities Claims Coinsurance Clause," a "Nuclear Energy Liability" exclusion, and a "Bank E & O Exclusion."

The D & O plaintiffs claim that although the eight provisions in section XI are not explicitly labeled as endorsements, it is clear that they are the endorsements that are intended to control the scope of the Run–Off Coverage. Plaintiffs first note that, in the binder that National Union issued for the policy, National Union itself described the eight clauses as "endorsements" to the Run–Off Coverage, by stating (emphasis added):

> The following endorsements will be part of the basic policy:

---

4. The D & O plaintiffs point out that in an earlier draft of endorsement 17, Section XI (which was then section X) began with the following: "It is further understood and agreed that for the purposes of this endorsement only, the following *endorsements* shall apply."

[A list of the various policy endorsements that became the first sixteen endorsements]

14. Endorsement with the run-off policy for Cole Taylor Financial Group, to include *the following endorsements:*

A. [A list of the eight clauses in section XI]

*See* 1 Russ & Segalla, Couch on Insurance 3D § 13:7 (1997) ("The binder is acceptable documentary evidence pertaining to the terms of the agreement between the parties."). Second, plaintiffs note that the structure and language of the eight clauses is the same as that used in other endorsements in the policy. As all but one of the first sixteen endorsements in the policy, each of the eight clauses begins with the introductory phrase: "In consideration of the premium charged, it is hereby understood and agreed ...." Moreover, a number of the eight clauses in section XI repeat, word for word, the provisions of the first sixteen endorsements.[5]

## C. *National Union's Denial of Coverage*

After receiving notice of the various shareholder class actions in late 1997 and early 1998, National Union denied coverage for these claims in a letter dated April 28, 1998, which stated that:

we understand that the Policy was not intended to respond to any losses resulting from or related to the Split–Off Transaction. Losses arising from any actual or alleged wrongful acts occurring in connection with the Cole Taylor divestiture were expected to be covered under the above-referenced St. Paul Policy, and notice to that effect was given to St. Paul. Further several endorsements were incorporated into the Policy to

achieve this result, including but not limited to [endorsements 9, 10, 12, and 15].

The letter also cited endorsement 5 (prior acts exclusion), exclusion 4(i) (the insured v. insured exclusion), and exclusion 4(d) (the prior notice exclusion).

In response to the tender of some additional claims, National Union sent a second letter on October 26, 1998 that cited the same reasons for denying coverage as the April 28 letter. The D & O plaintiffs subsequently served a contention interrogatory on National Union requesting all of the reasons for its position denying coverage. National Union's response, which was served on September 13, 2000, adopted the April 28 and October 26 letters as its position. When National Union served its answer to plaintiffs' second amended complaint on May 25, 2001, it included two additional exclusions that National Union relies upon to deny coverage—exclusion 4(a) (illegal profit exclusion) and exclusion 4(c) (the deliberate fraud exclusion).

Thus, in sum, National Union relies on four "exclusions" and five "endorsements" as its basis for denying coverage. The policy form exclusions relied upon by National Union as Separate Defenses 6, 7, 8, and 11, respectively, are those for illegal profits under section 4(a), deliberate fraud under section 4(c), prior notice under section 4(d), and insured v. insured under section 4(i). The endorsements relied on by National Union are:

- Endorsement 5—Prior acts exclusion for acts which occurred prior to February 12, 1997 (Separate Defense 12)

- Endorsement 9—Divestiture exclusion for claims arising out of the Split–Off Transaction (Separate Defense 9)

**5.** Clauses 5 and 8 of section XI repeat, verbatim, endorsements 6 and 14 of the policy. In addition, clauses 1 and 3 of section XI are highly similar to endorsements 2 and 4.

- Endorsement 10—Family exclusion for claims between members of the Cole and Taylor families (Separate Defense 10)

- Endorsement 12—Cross-claim exclusion for claims attributable to CTFG (Separate Defense 13)

- Endorsement 15—Exclusion for claims noticed to St. Paul (Separate Defense 8)

## III. DISCUSSION

### A. Standard of Decision

The burden of proving the applicability of any exclusions or limitations on insurance coverage lies with the insurer, as those are affirmative defenses. *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir.1996).

Federal Rule of Civil Procedure 56 provides for summary judgment in a party's favor on "all or any part" of a claim when, upon reviewing the factual record developed by the parties, there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c).

Under Rule 56, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has made the required showing, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial is present when the record would enable a reasonable trier of fact to find in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### B. Rules of Insurance Policy Construction

While Delaware is the forum state in this case, Illinois appears to be the state with the most significant contacts to the policy. Since neither the court nor the parties believes there are significant conflicts on any of the relevant legal principles, the court need not determine which state law controls and will set forth the guiding legal principles of insurance policy construction with reference to both state's laws.

The construction of an insurance policy is a matter of law for the court. *E.I. du Pont Nemours & Co. v. Allstate Ins. Co.*, 686 A.2d 152, 156 (1996); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740, 748 (1996). Absent an ambiguity that requires an inquiry into facts extrinsic to the policy, the construction of an insurance policy is an appropriate subject for disposition on summary judgment. *First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co.*, 803 F.2d 1308, 1312 (3d Cir.1986); *Outboard Marine*, 219 Ill.Dec. 62, 670 N.E.2d at 748.

In attempting to resolve a dispute between parties regarding the proper interpretation of the language of an insurance policy, a court should first seek to determine the parties' intent from the language of the insurance contract itself. *E.I. du Pont*, 686 A.2d at 156; *Michael Nicholas, Inc. v. Royal Ins. Co.*, 321 Ill.App.3d 909, 255 Ill.Dec. 82, 748 N.E.2d 786, 790 (2001); *Conagra v. Arkwright Mut. Ins. Co.*, 64 F.Supp.2d 754, 759 (N.D.Ill.1999). In so doing, the court must construe the policy "as a whole." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1219 (1992). All provisions should be given meaning and the policy should not be interpreted to render any part superfluous. *Id.; see also*

*E.I. du Pont Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1114 (1985) ("where possible, a court should give effect to all contract provisions."). In addition, "an insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit." *Steigler v. Insurance Co. of North America,* 384 A.2d 398, 401 (Del.1978).

A provision in an insurance policy is ambiguous if it is subject to more than one reasonable interpretation. *Economy Fire & Cas. Co. v. Bassett,* 170 Ill.App.3d 765, 121 Ill.Dec. 481, 525 N.E.2d 539, 542 (1988). However, a court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits. *First State Underwriters,* 803 F.2d at 1312. Thus, ambiguity in policy language will not be found to "exist merely because two conflicting interpretations may be suggested." *E.I. du Pont,* 686 A.2d at 156; *see also Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992). Rather, where the parties differ concerning the meaning of an insurance contract, the court will be guided by "a reasonable reading of the plain language of the policy." *E.I. du Pont,* 686 A.2d at 156; *see also Penn. Mut. Life Ins. Co. v. Oglesby,* 695 A.2d 1146, 1149 (1997) (stating that policies "must be interpreted in a common sense manner, giving effect to all provisions so that a reasonable policyholder can understand the scope and limitation of coverage.").

Where an ambiguity does exist, the ambiguity is generally resolved in favor of the insured and against the insurer. *See New Castle County, Del. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 174 F.3d 338, 344 (3d Cir.1999) ("due to the insurer's dominant position, when an ambiguity is found in insurance policy language, we must construe the language against the insurer as a matter of Delaware law");

*Penn Mut. Life Ins. Co.,* 695 A.2d at 1149–50 (explaining that "[T]he insurer ... is the entity in control of the process of articulating the terms [of an insurance contract]. The other party ... usually has very little to say about those terms except to take them or leave them or to select from limited options offered by the insurer.... Therefore, it is incumbent upon the dominant party to make the terms clear. Convoluted or confusing terms are the problem of the insurer ...–not the insured ...."). Because the rationale behind this, so called, "contra-insurer" rule of construction is based upon a presumption that insurance contracts are contracts of adhesion where the insurer holds a dominant bargaining position with respect to the substantive terms of the coverage, *see also Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York,* 519 F.Supp. 668, 672 (D.Del.1981), some courts have found that the rule of construing ambiguities against the insurer only applies where the insurer wrote the policy or is in a stronger bargaining position than the insured. *First State Underwriters,* 803 F.2d at 1312 ("the principle that ambiguities in policies should be strictly construed against the insurer does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy."); *see also Eagle Leasing Corp. v. Hartford Fire Ins. Co.,* 540 F.2d 1257, 1261 (5th Cir.1976) (contra-insurer rules have "no realistic application to a contract confected by a large corporation and a large insurance company each advised by competent counsel and informed experts."), *cert. den.,* 431 U.S. 967, 97 S.Ct. 2926, 53 L.Ed.2d 1063 (1977); *Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 637–39 (7th Cir.1991) (applying Ohio law and finding that where contract is not prepared by

insurer, but is co-drafted with the insured, the contra-insurer rule is not applicable).

■ Generally speaking, however, Delaware and Illinois courts continue to strictly construe ambiguities within insurance contracts against the insurer and in favor of the insured in situations where the insurer drafted the language that is being interpreted regardless of whether the insured is a large sophisticated company. *See New Castle County,* 174 F.3d at 344 (citing *Oglesby v. Penn Mut. Life Ins. Co.,* 877 F.Supp. 872 (D.Del.1994) for the proposition that "Delaware courts . . . consistently constru[e] ambiguities in favor of the insured as a matter of law."); *Tribune Co. v. Allstate Ins. Co.,* 306 Ill.App.3d 779, 239 Ill.Dec. 818, 715 N.E.2d 263, 273 (1999). The rationale behind this application of the rule is that ambiguities in contracts are generally interpreted against the drafter. Moreover, in the insurance policy context, such a rule reduces an insurance company's incentive to construct a policy where certain provisions purport to give coverage while other clauses take that very coverage away. *See, e.g., Sherman v. Underwriters at Lloyd's, London,* No. Civ. A.97M–09–028, 1999 WL 1223759, *3 (Del.Super.Ct. Nov.2, 1999) ("If two clauses are inconsistent and both were prepared by the insurer, the one which should defeat the insurance will be rejected or the one which affords the most protection to the insured will control and be given effect."); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.,* 832 F.2d 1037, 1045 (7th Cir.1987) ("In effect, one part of Ohio's policy insures against intentional torts or acts, while another part of the policy attempts to exclude coverage for these same acts. We therefore must resolve this ambiguity against Ohio.").

Thus, in determining whether to apply the contra-insurer rule and construe ambiguities against National Union, the court must determine whether National Union unilaterally drafted the ambiguous portions of the policy or whether CTFG, acting jointly with National Union, was responsible for drafting the ambiguous provisions of the policy. While there certainly may be instances where applying the contra-insurer rule would be inappropriate, this is not such an instance. It is clear from the documentary record before the court that CTFG had no substantial role in drafting the National Union policy form, on which the four exclusions relied upon by National Union to deny coverage were standard boilerplate terms. Therefore, should the court find an ambiguity in any of the section 4 exclusions on the policy form, the court will construe those exclusions against the drafter, National Union. With respect to the endorsements section of the policy, which contains the five endorsements relied upon by National Union to deny coverage, National Union has not set forth any evidence that it was CTFG or its representatives who decided to structure the run-off policy as endorsement 17 of the RAG policy nor has it come forward with any extrinsic evidence that would explain why the policy was structured in that manner. Therefore, should the court find an ambiguity in the endorsements section, it will construe it against National Union.

C. *Have the D & O Plaintiffs Met Their Burden of Demonstrating That National Union Cannot As a Matter of Law Assert the Exclusions Contained In Endorsements 5, 9, 10, 12, and 15 to Deny Coverage?*

The D & O plaintiffs assert coverage under the Run–Off Coverage set forth in endorsement 17 of the National Union policy. National Union relies, in part, on the exclusions contained in endorsements 5, 9,

10, 12, and 15 to deny Run–Off coverage. The issue before the court is whether the internal endorsements in section XI of endorsement 17 *replace* the policy's first sixteen endorsements—and the first sixteen endorsements are therefore inapplicable to the Run–Off Coverage, as the D & O plaintiffs contend—or whether the internal endorsements in section XI *supplement* the first sixteen endorsements, so that both sets of endorsements, to the extent they are consistent with each other, are applicable to the Run–Off Coverage, as National Union contends.

### 1. *The D & O Plaintiffs' Position*

The D & O plaintiffs contend that the language of the policy unambiguously demonstrates that the first sixteen endorsements, as a group, do not apply to the separate Run–Off Coverage contained in endorsement 17. Plaintiffs base their argument on the following three points: First, endorsement 17 has a complete, internal set of its own endorsements which controls the Run–Off Coverage. Second, the internal endorsements in endorsement 17 duplicate certain of the first sixteen endorsements. Plaintiffs argue that the only reason National Union would repeat certain of its policy endorsements in section XI of the Run–Off Coverage is that the first 16 endorsements were not intended to apply to the Run–Off Coverage. This demonstrates the parties' intent that endorsements 1–16 do not apply to the Run–Off Coverage in endorsement 17.

Finally, plaintiffs argue that applying the endorsements 1–16 of the RAG going forward coverage to the Run–Off Coverage would render illusory the Run–Off Coverage, for which National Union charged $900,000, because at least two of the endorsements would have the effect of completely eliminating the Run–Off Coverage. *See* Couch on Insurance 3d (1997) § 22.43

("The accepted rule is that where a repugnancy exists between different clauses of an insurance policy, the whole should, if possible, be construed so as to conform to the evidence consistent purpose of the parties."). For example, endorsement 5 provides that "the Insurer shall not be liable ... for alleged Wrongful Acts which occurred prior to 2/12/97." While this exclusion makes perfect sense for the going forward coverage for RAG, it cannot possibly apply, however, to the Run–Off Coverage, the sole purpose of which was to provide coverage for acts that occurred on or prior to February 12, 1997. Similarly, endorsement 12, the "Cross Claim Exclusion," provides that "the Insurer shall not make any payment for Loss in Connection with a Claim ..." brought by CTFG. Plaintiffs assert that this too cannot apply to the Run–Off Coverage, which is specifically issued to CTFG and covers acts committed by CTFG. Plaintiffs again note that while this endorsement makes sense for the going forward coverage issued to RAG, it makes no sense for the Run–Off Coverage.

### 2. *National Union's Position*

In response, National Union asserts that the plaintiffs fundamentally misconstrue the function of endorsement 17 and its relation to the other provisions of the National Union policy. National Union argues that because endorsement 17 amends the "policy," which consists of both the policy form and the endorsements thereto, it is the National Union policy as so amended which constitutes the Run–Off coverage issued to CTFG. Thus, according to National Union, the provisions in the policy and in endorsements 1–16 that are not expressly abrogated, waived, limited, or modified by the provisions of endorsement 17 are included as part of the Run–Off Coverage line of the policy. National Union urges that only the portions of en-

dorsements 1–16 that conflict with the run-off coverage be deemed not applicable thereto. This approach, National Union argues, does not eliminate the run-off coverage, but merely construes the policy as a whole.

Thus, according to National Union, because the Run–Off Coverage includes coverage for "wrongful acts" occurring on or before February 12, 1997, provisions in the National Union policy, including endorsement 5, the prior acts exclusion, and the portions of endorsement 12 which excludes from coverage claims attributable to wrongful acts committed by CTFG are "obviously not part of the run-off coverage and the National Union policy as amended by the run-off endorsement does not suggest or compel a construction otherwise."

National Union also asserts that a duplication in the language of a policy and of an endorsement does not necessarily raise a conflict between the policy and the endorsement; it just creates superfluous language. Therefore, National Union argues, the duplicate language contained in certain of the first sixteen endorsements and certain of the internal endorsements of section XI of endorsement 17 does not suggest that the parties intended, as the plaintiffs urge, that none of the first sixteen endorsements would apply to the run-off coverage. Last, National Union contends that plaintiff's approach would read out entire sections and provisions of the policy. In contrast, National Union submits that its construction properly gives effect to the entire agreement.

### 3. Do the First Sixteen Endorsements Apply to the Run–Off Coverage in Endorsement 17?

■ Despite the fact that the parties urge different constructions of endorsement 17, the court finds the endorsement to be unambiguous and holds that the eight endorsements of Section XI of endorsement 17 are the only endorsements applicable to the Run–Off Coverage set forth within. Endorsements 1–16 apply only to the going-forward coverage for RAG, but not to the Run–Off Coverage for CTFG. Moreover, even had the court determined that endorsement 17 was ambiguous, the court would have reached the same result by construing that ambiguity in favor of the D & O plaintiffs. See New Castle County, 174 F.3d at 344.

The D & O plaintiffs demonstrate in their briefing that CTFG's Run–Off Coverage, as set forth in endorsement 17, is structured as a policy within a policy. It has a different named insured from the main policy. It has its own internal set of endorsements, some of which repeat the language of certain of endorsements 1–16 verbatim. It carries its separate $900,000 premium. National Union nonetheless argues that the Run–Off Coverage's internal endorsements and endorsements 1–16 of the going forward coverage both apply to the Run–Off Coverage. The court finds that National Union's proffered construction is untenable; the D & O plaintiffs urged construction that only the eight internal endorsements contained in endorsement 17 apply to the Run–Off Coverage is the only reasonable reading of the policy. See Penn. Mut. Life Ins. Co., 695 A.2d at 1149.

National Union argues that "those provisions of the National Union policy that are not expressly or by clear implication amended by endorsement 17 constitute the run-off coverage." Endorsement 17, however, does not expressly amend any relevant provisions of the National Union policy. No clause in endorsement 17 states that it is amending one of the earlier endorsements 1–16 such that, as amended, the clause applies to the Run–Off Coverage. Because the National Union policy

actually contains two distinct policies, such amendments would be highly confusing, as certain phrases would apply to one set of coverage, while later clauses would amend those phrases such that the same phrases would apply to a second set of coverage. Perhaps in recognition of the potential unwieldiness of such a document, endorsement 17 is instead drafted with its own clear set of endorsements, contained in Section XI.

The interpretation that endorsements 1–16 do not apply to the Run–Off Coverage in endorsement 17 is buttressed by the structure and language of the policy itself. First, a number of the first 16 endorsements are repeated word for word in the Run–Off Coverage endorsement section. While National Union attempts to minimize the significance of this "superfluous language," the very fact that the parties listed certain of the first 16 endorsements again within the endorsements of endorsement 17 demonstrates that the parties did not believe that the first 16 endorsements applied to the Run–Off Coverage, but instead believed that endorsement 17 was a stand alone separate policy with its own separate endorsements. Second, if the parties repeated only certain endorsements within endorsement 17, why would other of the first sixteen endorsements that were not repeated within that endorsement be found to apply to the coverage within? Third, as plaintiffs point out in their opening brief, endorsement 18 expressly amends one of the endorsements in the Run–Off Coverage (the Bank E & O Exclusion) so as to conform it to endorsement 14 of the RAG policy. If, as National Union contends, endorsement 14 applied to the Run–Off Coverage, then this portion of endorsement 18 is unnecessary. The fact that the parties thought it necessary to amend one of the run-off endorsements in this fashion clearly demonstrates the parties understanding that the first 16 endorsements did not apply to the Run–Off Coverage and that the Run–Off Coverage, with its own set of endorsements, stands alone.

Moreover, as the plaintiffs have pointed out, certain endorsements within the first sixteen endorsements, such as endorsement 5, which excludes coverage for Wrongful Acts prior to February 12, 1997, and endorsement 12, which excludes coverage for losses in connection with a claim brought by CTFG, are clearly intended to apply to the going forward coverage for RAG but are flatly inconsistent with the coverage grant of the Run–Off Coverage. National Union concedes that these endorsements do not apply to the Run–Off Coverage for this very reason. National Union, however, asserts that these endorsements, while not expressly amended, are "by clear implication amended by endorsement 17." Thus, according to National Union, in order to figure out which endorsements apply to the Run–Off Coverage, one must review each endorsement and determine by "implication" which apply to the Run–Off Coverage. Those whose language is inconsistent with the coverage provided to CTFG under the run-off endorsement do not apply, while those whose language is not inconsistent with that coverage still apply. Under such a reading, certain of the first sixteen endorsements, such as endorsements 10 and 15, apply to the Run–Off Coverage, others, such as endorsements 5 and 12 do not apply to the Run–Off Coverage, while still other endorsements, such as endorsements 6 and 14 are repeated word for word in the Run–Off Coverage. This selective and confusing interpretation is not a reasonable reading of the policy. A policy is a contract—not a puzzle. No rational drafter would create such a jumble in which one must determine by "implication" which endorsements apply to what. The simpler,

more coherent, and only reasonable reading of the policy endorsements is that the parties put a separate and complete set of endorsements in the Run–Off Coverage because endorsements 1–16 were only intended to apply to the RAG coverage.

National Union argues that if the court adopts the plaintiffs' construction, it will be reading out entire sections of the agreement and, therefore, will not be giving effect to the entire contract. The court disagrees. Despite the boilerplate language in the conclusion of endorsement 17, which states that "all other terms, conditions, and exclusions shall remain unchanged," the structure and language of the two coverages-in-one policy make evident that each of the first sixteen endorsements is meant to apply to the RAG going forward coverage, while endorsement 17 is meant to apply to the CTFG Run–Off Coverage. In so finding, the court does not "read out" sections of the contract. Instead, it reads the agreement as a whole and finds two sets of coverages, each of which has its own set of endorsements. Because the D & O plaintiffs are asserting claims solely under the run-off line of coverage, the exclusions relating to the RAG coverage are not applicable.

The only reasonable reading of a contract is that which gives meaning and effect to each of the clauses and which does not render any contract clause superfluous in view of the policy as a whole. *See Outboard Marine*, 180 Ill.Dec. 691, 607 N.E.2d at 1219 ("The court must construe the policy as whole.... A court must strive to give each term in the policy meaning."); *E.I du Pont*, 498 A.2d at 1114. In light of these standards and for the reasons set forth above, the court finds

that the only interpretation that is reasonable is that of the D & O plaintiffs. Therefore, the court will grant the D & O plaintiffs' summary judgment motion with respect to National Union's Separate Defenses 8, 9, 10, 12, and 13. Those defenses respectively assert exclusions found in endorsement 15 (exclusion for claims noticed to St. Paul), endorsement 9 (divestiture exclusion for claims arising out of the split-off transaction), endorsement 10 (family exclusion for claims between members of the Cole and Taylor families), endorsement 5 (prior acts exclusion for acts prior to February 12, 1997), and endorsement 12 (cross-claim exclusion for claims attributable to CTFG).[6]

D. *Have the D & O Plaintiffs Met Their Burden of Demonstrating That The Policy Form Exclusions in Section 4 Provide No Basis for National Union to Deny Coverage As A Matter of Law?*

The court will next address the portions of the D & O plaintiffs' motion relating to the policy form exclusions 4(a), (c), (d), and (i). These exclusions are contained in section 4 of the pre-printed insurance policy form that is part of the National Union policy. Unlike the exclusions contained in endorsements 1–16, the parties agree that, as a matter of contract law, these exclusions apply to both the going-forward coverage and the Run–Off Coverage. National Union relies on exclusions 4(a), (c), (d), and (i) to deny coverage to the D & O plaintiffs' claims. Plaintiffs argue that each of the exclusions does not apply to the claims at issue as a matter of law and contend that National Union attempts to interpret its exclusions so as to swallow up

---

6. In light of the court's determination that endorsements 1–16 do not apply to the Run–Off Coverage, the court need not consider D & O plaintiffs' alternative arguments that endorsements 5, 9, 10, 12, and 15 should not be found applicable to the claims made, even should the court find that endorsements 1–16 do apply to the Run–Off Coverage.

the very coverage the policy purports to offer.

### 1. *Should National Union be Estopped From Asserting Exclusion 4(a) and 4(c)?*

■ The D & O plaintiffs first argue that National Union should be barred from asserting that exclusions 4(a) and 4(c) apply to the claim at issue due to its failure to identify those reasons for denying coverage when it responded to the plaintiffs' contention interrogatory that asked for "each and every reason you [National Union] contend the claims are not covered." National Union did not list exclusions 4(a) and 4(c) in its response. Because a response to a contention interrogatory is a judicial admission, plaintiffs assert that National Union is estopped from now contending that there are additional exclusions that apply to the claims at issue. *See McSparran v. Hanigan,* 225 F.Supp. 628, 636–37 (E.D.Pa.1963), *aff'd,* 356 F.2d 983 (3d Cir.1966) (an answer to a request under Rule 36 is ... a studied response ... to a request to assert the truth or falsity of a relevant fact pointed out by the request for admission .... Therefore, their similarity to sworn testimony in one respect should not reduce their effect from conclusive admissions to merely evidential ones.); *see also* 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2264, at 742–43 ("A judicial admission, deliberately drafted by counsel for the express purpose of limiting and defining the facts in issue, is traditionally regarded as conclusive, and an admission under Rule 36 falls into this category.").

In response to plaintiffs' estoppel argument, National Union argues that there should be no estoppel because it did not complete its review of the document and deposition discovery from the Reliance Securities Litigation until after its interrogatory response was served. Moreover, National Union expressly reserved the right to make "supplemental responses to plaintiffs' interrogatories and document requests if additional grounds for objections or supplemental responses are ascertained."

The court will not strip National Union of potentially meritorious defenses simply because it failed to determine whether it would assert such defenses until after it had responded to plaintiffs' contention interrogatories. Accordingly, the court will determine whether those defenses survive summary judgment on the merits.

### 2. *Does the Plain Language of the Section 4 Exclusions Preclude National Union from Denying Coverage?*

Plaintiffs next contend that the plain language of each of the four exclusions indicates that it does not apply to the claims for which plaintiffs seek coverage. National Union contends that summary judgment is improper because there remain disputed issues of material fact with respect to each exclusion.

#### a. *Exclusion 4(c): crime or deliberate fraud*

Exclusion 4(c) excludes claims "arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraud." Plaintiffs contend that this provision cannot be read so broadly as to cover securities fraud, because the policy purports to cover "Securities Claims" and exclusions should not be read to override an explicit grant of coverage.

National Union asserts in its opposing brief that there is an issue of fact in the Reliance Securities Litigation as to whether various CTFG directors, including some of the D & O plaintiffs, acted with the requisite scienter for the purpose of section 10(b) liability. National Union also takes issue with the plaintiffs' contention

that this exclusion renders its coverage for securities claims illusory and sets forth two reasons why it believes the exclusion can be consistent with its coverage for securities claims. First, there can be a violation of the federal securities laws without a finding of criminal or deliberate fraudulent intent. *See, e.g.,* 15 U.S.C. § 77j(b) (recklessness is sufficient for a finding of liability under SEC Rule 10b–5); 15 U.S.C. § 78n(a) (negligent conduct is sufficient for a finding of liability under Section 14(a) of the Securities Exchange Act of 1934); *In re Reliance Sec. Litig.,* 135 F.Supp.2d at 506, 511. Therefore, a policy can cover a number of securities fraud claims while still providing an exclusion for claims that arise out of "deliberate fraudulent intent." Second, there must be a judicial determination of deliberate fraudulent conduct before 4(c) is available to bar coverage under the policy. Thus, National Union explains, exclusion 4(c) may not be used to deny coverage for legal fees and expenses associated with defending a claim otherwise covered by the policy. *See National Union Fire Ins. Co. v. Continental Ill. Corp.,* 666 F.Supp. 1180, 1197–98 (N.D.Ill.1987).

In order to evaluate the parties' positions, the court must first review the relevant portions of the National Union policy coverage grant. The coverage grant in the insuring agreement purports to cover all loss "arising from a Claim." The term "claim" is defined within to include "a civil, criminal, or administrative proceeding for monetary or on monetary relief." The definition of "claim" then adds that:

the term 'Claim' shall include a 'Securities Claim'; provided, however, that with respect to Coverage B(i) [entity coverage] only, Claim or Securities Claim shall not mean a criminal or ad-

ministrative proceeding against the Company.

A "Securities Claim" is defined as:

a Claim made against the insured that alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934 ... which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company.

"Wrongful Act" is defined as "any breach of duty, neglect, error, misstatement, misleading statement, omission, or act by the Directors and Officers of the Company in their respective capacities as such ...." Thus, according to the definitions set forth in the policy, the National Union policy provides an explicit and broad grant of coverage for securities fraud claims. With respect to individual officers and directors, the securities fraud coverage includes even criminal proceedings commenced by indictment.

■ Given that the National Union policy explicitly covers securities fraud claims, the issue before the court is whether exclusion 4(c), which excludes claims "arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraud," can be properly construed to exclude coverage for securities fraud claims. The D & O plaintiffs argue that it cannot and submit that if exclusion 4(c) it is so interpreted it will directly conflict with the coverage grant of the policy. The D & O plaintiffs reason that when one provision of an insurance policy appears to cancel coverage provided for in another provision, this creates an ambiguity that must be construed in favor of the insured.

The D & O plaintiffs find support for their position by analogizing to a number

of insurance cases that address policies which specifically provide coverage for claims arising from intentional torts, such as defamation, false imprisonment, and malicious prosecution, but then attempt to exclude coverage based on intentional conduct exclusions. In such circumstances, courts have almost universally held that the exclusion does not apply. *See Imperial Cas. and Indem. Co. v. State of Conn.,* 246 Conn. 313, 714 A.2d 1230, 1237 (1998); *North Bank v. Cincinnati Ins. Co.,* 125 F.3d 983, 986–86 (6th Cir.1997); *see also Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995); *Purrelli v. State Farm Fire and Cas. Co.,* 698 So.2d 618, 619 (Fla.App.1997). For example, the Connecticut Supreme Court held in *Imperial Cas. and Indem. Co.,* 714 A.2d at 1237:

> Indeed, coverage for damages resulting from several intentional causes of action—such as false arrest, false imprisonment, malicious prosecution, and § 1983 actions, would be excluded even though the policy purports to provide coverage for personal injuries resulting from those causes of action. The latter result hardly seems rational, and we have difficulty imagining that the [insureds] could have intended to purchase a policy of insurance that excluded such coverage.

Similarly, in *North Bank,* 125 F.3d at 986–86, the Sixth Circuit discussed the treatment of conflicting provisions in an insurance policy that appear to provide coverage in one provision only to eliminate it in another provision:

> In selling the policies, the insurance company uses these conflicting provisions to "create the impression that the policy provides coverage for an employer's intentional employment discrimination," but when an insured attempts to claim coverage the insurance company

argues that the discrimination is not actually covered by the policy.

Similarly, we are persuaded that the defendant insurance company should not be permitted to sell the bank a policy covering discrimination claims and then refuse to cover garden variety discrimination claims like the Shellenbarger case.

Plaintiffs argue that if one substituted "securities fraud" for "discrimination," the above quoted passage would apply perfectly to this case.

In response, National Union argues that securities fraud coverage would not be eliminated by the deliberate fraud exclusion because certain securities fraud claims can be sustained based on recklessness or negligence, and exclusion 4(c) only applies to "deliberate fraud." In the face of the National Union policy's broad coverage for securities claims under both the '33 Act and '34 Act, the court finds National Union's argument unconvincing. In essence, National Union is suggesting that where the policy states that it provides coverage for securities claims under the '33 and '34 Acts, it actually only provides coverage for those claims that are based on reckless or negligent behavior. The fact that some limited amount of coverage might survive the intentional act exclusion is not sufficient grounds to apply an exclusion that is irreconcilable with the coverage grant itself, because no one purchasing a policy that provides coverage for securities claims under the '33 and '34 Acts would intend to purchase such restricted coverage. *See Imperial Cas. and Indem.,* 714 A.2d at 1238 (rejecting interpretation that would only cover non-intentional torts); *Davidson v. Cincinnati Ins. Co.,* 572 N.E.2d 502, 508 (Ind.App.1991) (holding that intentional act exclusion did not apply to slander and malicious prosecution coverage, even though such claims might be

based on reckless behavior, because "most cases involving malicious prosecution and slander are a result of an intentional wrongdoing"). Even though certain securities claims do not require intentional misconduct, applying the intentional fraud exclusion to the securities coverage at issue would eviscerate coverage for the majority of securities claims.

If the deliberate fraud exclusion applied to securities claims, there would be little or nothing left to that coverage. Particularly, in a D & O insurance policy, where securities fraud claims are among the most common claims filed against directors and officers, the effect of such an exclusion would be particularly devastating. No insured would expect such limited coverage from a policy that purports to cover all types of securities fraud claims. *See Steigler*, 384 A.2d at 401 (holding that insurance contract should be read "to accord with the reasonable expectations of the purchaser").[7] Accordingly, the court finds that exclusion 4(c) may not be relied upon by National Union to defeat coverage for the claims asserted by the D & O plaintiffs and will grant summary judgment in favor of the D & O plaintiffs on National Union's Separate Defense 7.

### b. *Exclusion 4(a): illegal profit or advantage*

Exclusion 4(a) excludes claims "arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an insured was not legally entitled." To invoke this exclusion, plaintiffs assert that National Union must first show that there are allegations of an insured gaining illegal profit or advantage and

then National Union must prove that such illegal profit or gain actually occurred. *See National Union Fire Ins. Co. of Pittsburgh*, 666 F.Supp. at 1199 (noting that claims are "not 'based on or attributable to' certain conduct unless they *allege* such conduct"). Furthermore, National Union must prove this separately for each insured because the policy provides that "the Wrongful Act of a Director or Officer shall not be imputed to any other Director or Officer."

■ With respect to the class action securities claim and Estate Representative's breach of fiduciary duty claims, plaintiffs contend that there are no allegations that their profit or gain itself was illegal. Rather, the "illegal" conduct that is alleged is the dissemination of false or misleading disclosures in violation of federal securities laws. With respect to the Estate Representative's fraudulent transfer claims, while conceding that these claims fall within the scope of the illegal profit or gain exclusion, the plaintiffs contend that National Union must prove these claims on the merits. Plaintiffs also argue, as they did above in opposing exclusion 4(c), that if the exclusion is given the broad construction sought by National Union, then the exclusion eviscerates the very coverage that the policy was purchased to provide, because plaintiffs allege in virtually all securities fraud claims that the offending directors and officers secured some gain from their unlawful conduct.

National Union asserts in response that there are allegations and questions of material fact regarding the conduct of some

---

**7.** The court is also persuaded by another line of cases holding that the general policy of construing ambiguous provision against the insurance company who drafted them applies with even more force when evaluating exclusions. *See Watkins v. Brown*, 97 Ohio App.3d 160, 646 N.E.2d 485, 487 (1994); *United* *States Fidelity & Guaranty Co. v. Lightning Rod Mutual Ins. Co.*, 80 Ohio St.3d 584, 687 N.E.2d 717, 719 (1997) (requiring that ambiguity within an insurance contract be construed strictly against the insurer and liberally in favor of the insured).

of the D & O plaintiffs in the Reliance securities litigation complaint as to whether they actually gained a profit or advantage to which they were not legally entitled. National Union contends that it was alleged in the securities class action and Estate Representative complaints that the Taylor Family defendants obtained the Cole Taylor Bank by issuing false and misleading statements regarding the financial condition of CTFG and the benefit to the company shareholder of the split-off transaction. At the very least, National Union argues, the conduct of each of the plaintiffs as alleged in the Reliance securities litigation raises a question of fact as to whether the individual plaintiffs actually gained a profit or advantage to which they were not legally entitled by virtue of their acquisition of Cole Taylor Bank in the split-off transaction. While conceding that the applicability of exclusion 4(a) must be established separately for each D & O plaintiff, National Union notes that three of the D & O plaintiffs are Taylor family members who were beneficiaries of the split-off transaction. National Union also responds that exclusion 4(a) does not, as the plaintiffs argue, "effectively swallow" the securities coverage provided in the policy because it is only available to bar coverage once there has been an adjudication of illegal profit or gain.

The court's analysis necessarily begins with the language of the exclusion at issue. Exclusion 4(a) excludes claims "arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an insured was not legally entitled." As plaintiffs correctly note, the successful invocation of this exclusion requires National Union to identify allegations in the complaints[8] that allege that the D & O

plaintiffs gained "any profit or advantage to which [they] were not entitled." *See id.* While National Union characterizes the allegations in the Graham complaint as alleging that "the Taylor family defendants obtained the Cole Taylor Bank by issuing false and misleading statements regarding the financial condition of CTFG ...," without identifying a specific allegation, the exclusion at issue requires the court to more carefully examine the allegations in the complaint to determine if they contained any allegation that the D & O plaintiffs obtained an illegal profit or gain.

Paragraphs 128 and 129 of the securities class action complaint state that the false or misleading representations regarding the financial condition of RAG,

> inflated the price of Reliance's common stock and the value of the defendant's personal holdings, and permitted defendants to protect and enhance their executive positions and substantially increase their compensation. These falsehoods permitted the Taylor family defendants and their allies Tinsberg, Pearl, Dougherty, and Alstrin to convince the majority of shareholders to vote to approve the transaction in which the Taylor's took the valuable bank subsidiary while the other shareholders received ownership of the subprime subsidiary, which was virtually worthless.

Similarly, the Estate Representative's adversary proceeding complaint alleges that the Taylor defendants "looted the Company of its only valuable assets and [ ] managed and operated the Company principally for their own benefit," detailing that:

> Once the Taylors understood the severity of the problems that their own

8. Because the D & O plaintiffs do not dispute that, if proved, the Estate Representative's allegations of fraudulent transfer would qualify for exclusion 4(a), the court will limit its examination of the allegations of the complaints to those involving the securities class action and the breach of fiduciary duty claims.

program of unrestrained growth had engendered, they began to develop an alternative, whereby, in hope of extricating themselves from RAC's financial morass, they would buy CT Bank and CT Mortgage with their own RAG common stock and leave existing shareholders with a greater percentage ownership interests in the resultant worthless enterprise. This alternative came to be known as the Split–Off [Transaction].

As previously noted, the underlying causes of action alleged in the securities case were violations of §§ 10(b), 14(a), and 20(a) of the Exchange Act of 1934 and breach of fiduciary duty. The Estate Representative's complaint also alleged a breach of fiduciary duty.[9]

The court finds that while the allegations detailed above state that as a result of the D & O plaintiffs fraudulent conduct the Taylor family benefitted from the split-off transaction, they fail to allege that the D & O plaintiffs' profit or gain was itself illegal and do not seek disgorgement of illegal profit or gain. This is what is required for exclusion 4(a), which excludes claims "arising out of, based upon or attributable to" the gaining of profit to which the D & O is not legally entitled. Exclusion 4(a), by its terms, requires a profit or gain that is illegal; not an illegal act that produces a profit or gain to the insured as a by-product. This exclusion, therefore, would be applicable in cases of theft, such as insider trading, but is inapplicable to illegalities such as securities misrepresentation to which a private gain might be incidental. While the securities complaint arguably alleges that the financial benefit to the Taylor defendants was a reason for their conduct, the only illegalities alleged

are false and misleading disclosures in violation of the federal securities law. The "illegal" conduct is the alleged dissemination of false information. Similarly, the breach of fiduciary duty claim alleges that the Taylor's breached their duty of loyalty to the company in the manner in which they ran the company and in various actions concerning the split-off transaction. The alleged "illegal" conduct is the breach of this duty; not the incidental gains therefrom.

Almost all securities fraud complaints will allege that the defendants did what they did in order to benefit themselves in some way. If such an allegation were sufficient to invoke the protections of 4(a), the broad coverage for "Securities Claims" provided by the National Union policy would be rendered valueless by this exclusion. The proper inquiry, therefore, must focus not only on the factual allegations, but on the elements of the causes of action that are alleged. If an element of the cause of action that must be proved requires that the insured gained a profit or advantage to which he was not legally entitled, then, if proved, this exclusion would be applicable. That is not the case here.

National Union cites *Bogatin v. Federal Ins. Co.*, No. 99–4441, 2000 WL 804433 (E.D.Pa. June 21, 2000), for the proposition that the allegations in the securities class action lawsuit here are sufficient such that plaintiffs conduct, if proved, would fall within the scope of exclusion 4(a). In *Bogatin*, the court held that an exclusion in an insurance policy for "any claim based upon, arising from, or in consequence of any insured person having gained in fact any personal profit, remuneration, or advantage to which such insured person was

---

**9.** As stated, *supra*, in note 8 the court is not considering the Allen complaint's fraudulent transfer claim in connection with this opin-

ion, because the plaintiffs concede that, if proven, that claim would fall within exclusion 4(a).

not legally entitled" potentially applied where the insured was named as a defendant in a series of securities class action lawsuits and it was alleged that the insured directors and officers made intentional misrepresentations concerning their business in order to further their personal interests and gain. The first class action complaint in *Bogatin* alleged that the D & O plaintiff violated Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5 "by knowingly or recklessly employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the purchases of [the Company's] securities." *Bogatin*, 2000 WL 804433 at ¶ 115, *21. This complaint also included allegations of insider trading. *Id.* A second class action complaint included allegations of illegal activities, money laundering, and illegally and personally profiting from the sale of the Company's stock. A third and fourth class action complaint alleged "that plaintiff made intentional misrepresentations concerning the Company's business in order to further his personal interests and gain." *Id.* 2000 WL 804433 at ¶ 117–19, *22.

Aside from the fact that the *Bogatin* opinion relied on by National Union is of limited persuasive value because it simply lists factual findings and legal conclusions with little legal reasoning, the court finds *Bogatin* distinguishable from the instant case. The *Bogatin* allegations included not only securities fraud, but criminal conduct such as theft and insider trading. National Union submits that the findings of *Bogatin* should apply here, even absent the insider trading and other assorted theft-based allegations, and that basic allegations of securities fraud allegations are sufficient to meet such an exclusion. The court disagrees. As stated above and in addressing exclusion 4(c), such an interpretation of exclusion 4(a) its simply too

broad and would swallow up the very securities coverage the National Union policy purports to grant.

Accordingly, the court finds that exclusion 4(a) may not be relied upon by National Union to defeat coverage for the claims asserted by the D & O plaintiffs for coverage for securities claims and breach of fiduciary duty and will grant partial summary judgment in favor of the D & O plaintiffs on National Union's Separate Defense 6. However, with respect to the fraudulent transfer claims, the court finds that the D & O plaintiffs have failed to meet their burden on summary judgment. National Union, should it be able to use the facts developed during discovery to prove that the allegations of fraudulent transfer are true, could rely on exclusion 4(a) to deny coverage. The court will deny the D & O plaintiffs motion for partial summary judgment on this portion of National Union's Separate Defense 6.

### c. *Exclusion 4(d): notice under prior policy*

██  Exclusion 4(d) applies to claims "alleging, arising out of ... any claim which has been reported, or in any circumstances of which notice has been given ... under any policy of which this policy is a renewal or replacement or which it may succeed in time." Plaintiffs contend that notwithstanding the delivery of a July 30, 1997 notice of circumstances letter to St. Paul, this exclusion does not apply because the National Union policy was in effect at the same time as the St. Paul Program and is therefore not a "renewal, replacement, or successor in time" to the St. Paul Program.

National Union contends that the National Union policy did in fact replace and succeed in time the St. Paul program, because the National Union policy period began after, and extended months beyond,

the St. Paul Program policy period. National Union also relies on endorsement 15, which amended exclusion 4(d) by stipulating that a notification to St. Paul of potential wrongful acts prior to July 31, 1997, triggered the provisions of exclusion 4(d) for any claims ultimately interposed which related to the matters described in said notification. Based on the court's determination that endorsements 1–16 do not apply to the Run–Off Coverage, the court will not rely on endorsement 15.[10]

Plaintiffs argue that the National Union policy was neither a renewal, replacement, nor successor in time to the St. Paul policy because from February 12, 1997 through July 31, 1997, the St. Paul and National Union policies ran concurrently. It is undisputed that the St. Paul Program was effective from July 31, 1996 through at least July 31, 1997, and that the National Union policy was effective from February 12, 1997 through at least February 12, 1998. Thus both policies were in effect from February 12, 1997 through at least July 31, 1997. Moreover, coverage for claims under the St. Paul Program did not cease entirely after July 31, 1997. Section 7 of the St. Paul policy provides coverage for later-filed claims that arise out of any potential "Wrongful Acts" that are noticed to St. Paul during the policy period. The provision states in full:

> If during the Policy Period the Insured or the Corporation shall become aware of any potential Wrongful Act which may subsequently give rise to a Claim being made against the Insured and the Insured or the Corporation shall give written notice during the Policy Period of the Wrongful Act and the reasons for anticipating a Claim, with full particu-

lars as to the dates and person involved, then any Claim which is subsequently made against the Insureds arising out of such potential Wrongful Act shall be treated as a Claim made during the Policy Period.

The claims for which the plaintiffs seek coverage fall under this provision because the plaintiffs provided such notice to St. Paul on July 30, 1997 and the claims for which the plaintiffs seek coverage both the shareholder class actions and the Estate Representative's actions arose out of the potential wrongful acts set forth in that notice. National Union, however, asserts that the notice to St. Paul triggered exclusion 4(d) of its policy.

Before turning to exclusion 4(d), the court will first examine whether the National Union policy is an excess policy over the St. Paul Program policies. The D & O plaintiffs also seek a declaration that the National Union policy is in excess of anything that is collected from the St. Paul Program. The court finds that it is clear from the language of the policy that the National Union policy is excess of the St. Paul Program policies. Paragraph 14 of the National Union policy, which is entitled "Other Insurance and Indemnification," provides that "[s]uch insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance." National Union also represented that its policy would be in excess of the St. Paul Program, when it stated that "...the [ ]policy will provide run-off coverage (for Wrongful Acts committed prior to 2/12/97) for a period of 6 years, and the coverage provided by this endorsement, will also be in excess of the St. Paul led program."

---

**10.** Moreover, even if the court were to consider exclusion 4(d) as amended by endorsement 15, for the reasons set forth below, the court finds endorsement 15 irrelevant to the deter-

mination of whether National Union policy was a renewal, replacement, nor successor in time to the St. Paul policy.

National Union argues, however, that the National Union policy is only excess of the St. Paul Program policies to the extent that pertinent exclusions, such as the endorsement 9, the divestiture exclusion, and exclusion 4(d), the prior notice exclusion, are not available to bar coverage under the National Union policy. Naturally, the excess coverage provided in the National Union policy includes any exclusions to deny coverage that have not been disposed of on summary judgment. However, as the court has found that the divestiture endorsement does not apply to the run-off coverage, National Union may no longer rely on that defense to coverage. Accordingly, the court will grant the D & O plaintiffs' motion seeking a declaration that, subject to any remaining defenses, the National Union policy provides for up to $30 million of excess insurance coverage over any insurance collected from the St. Paul Program.

The court must next determine whether, in light of the July 30, 1997 notice of circumstances letter that was sent to St. Paul, the prior notice exclusion 4(d) may be relied upon by National Union to deny coverage. In determining whether this exclusion applies, the court must determine whether the National Union policy was a "renewal, replacement, or successor in time" to the St. Paul Program. The court finds that because the claims for which coverage is sought were noticed to both the St. Paul Program and National Union at a time when both programs were concurrently providing coverage, the National Union policy cannot be said to be "renewal, replacement, or successor in time" to the St. Paul Program. While it is true that notice provisions generally operate to allocate claims to different policies or periods, see *Morgan Stanley Group, Inc. v.*

*New England Ins. Co.*, 225 F.3d 270, 280 (2d Cir.2000), where, as here, two policies are in effect during the same time period, a plaintiff's assertion of claims under one of two concurrently running coverages cannot rely on such a rationale to bar the assertion of coverage claim under the second policy. Therefore, the court finds that exclusion 4(d) may not be relied upon by National Union to defeat coverage for the claims asserted by the D & O plaintiffs and will grant summary judgment in favor of the D & O plaintiffs on National Union's Separate Defense 8.

d. *Exclusion 4(i): insured v. insured*

■ Exclusion 4(i), the insured v. insured exclusion, excludes from coverage any claim made against an Insured "which is brought by any Insured or by the Company ...." With respect to exclusion 4(i), the plaintiffs rely on the briefing in prior summary judgment motions submitted by the Estate Representative.[11] In those briefs, the Estate Representative argues that exclusion 4(i) does not apply to bar coverage with respect to claims that the Estate Representative has asserted against the plaintiffs because the RAG Estate Representative is not the "Insured" within the meaning of exclusion 4(i). While RAG was the debtor-in-possession at the time the plaintiffs originally filed this action on May 28, 1998, under Bankruptcy Rule 2012(a), once the Estate Representative was appointed, "the debtor-in-possession" ceases to exist and the Estate Representative is deemed automatically substituted for the debtor-in-possession "as a party in any pending action, proceeding, or matter." *In re TS Indus., Inc.*, 125 B.R. 638, 641 (Bankr.D.Utah 1991).

National Union also relies on its earlier briefing and that of the other insurance

---

11. Although this topic was the subject of a separate set of briefing (D.I.117, 156, 158), the court will resolve that dispute in the context of this opinion.

companies with respect to this exclusion and asserts that this exclusion is applicable to the claims that have been interposed by the Estate Representative against the former directors and officers of RAG because the RAG Estate shares identity with RAG, the Insured.

The court agrees with the D & O plaintiffs and the Estate Representative that the "insured v. insured" exclusion should not apply to claims brought by a bankruptcy Estate Representative against the former directors and officers of the Debtor where the Debtor is the insured entity, because the Debtor's Estate Representative (the RAG Estate) and the Debtor (RAG) are separate entities. *See In re Buckeye Countrymark, Inc.,* 251 B.R. 835 (Bkrtcy.S.D.Ohio 2000); *Pintlar Corp. v. Fidelity and Cas. Co. of N.Y. (In re Pintlar Corp.),* 205 B.R. 945 (Bankr.D.Idaho 1997); *but see Reliance Co. of Illinois v. Weis,* 148 B.R. 575, 581–82 (E.D.Mo.1992) (finding identity between estate and Debtor in evaluating applicability of an insured v. insured provision because claims could have been brought by the company).

In *In re Buckeye,* the court rejected an argument that claims for breach of fiduciary duties brought by a bankruptcy trustee against the debtor's former officers and directors were barred by an insured v. insured provision that excluded claims brought "by" or "on behalf of" the Debtor against its directors, officers, and managers. The court finds the reasoning of *Buckeye* particularly applicable to its explain why it now determines that the claims made by the Estate Representative against the D & O plaintiffs in this case do not fall within the National Union policy's insured v. insured exclusion. Simply put, the court finds that claims brought "by" the Estate Representative are not the same as claims brought "by" the Debtor

under the exclusionary provision. As the *Buckeye* court explained:

> the very purpose of the an 'insured v. insured' exclusion does not apply to adversarial claims brought by the Trustee against the Debtor's directors and officers and managers. The intent behind the 'insured v. insured' exclusion in a[D & O] Policy is to protect the insurance companies against collusive suits between the insured corporation and its insured officers and directors. [citation omitted] When the plaintiff is not the corporation but a bankruptcy trustee acting as a genuinely adverse party to the defendant officers and directors, there is no threat of collusion. 251 B.R. at 840–41.

Here, there is no collusion between the Estate Representative and the D & O plaintiffs. While it is true that the company itself could have brought such claims against its directors and officers, the Estate's claims are asserted on behalf of the Debtor's creditors and not on behalf of the Debtor itself. Thus, the Estate Representative is acting as a genuinely adverse party to the Debtor's former directors and officers.

National Union argues that reliance on cases such as *Buckeye,* which examine the intent behind insured v. insured provisions, is misplaced because the intent behind a provision should not be examined unless an ambiguity is found. Courts, however, are required to interpret the language of a contract in such a way as to give effect to the intention of the parties at the time the agreement was entered into. The court, here, has not varied the plain language of the agreement, but rather, in determining that the Estate is not the Debtor, has resolved the insured v. insured dispute by determining that due to the status of the Debtor Estate, the adversary proceeding claims do not fall within the plain language

of the exclusion. Accordingly, the court finds that exclusion 4(i) may not be relied upon by National Union to defeat coverage for the claims asserted by the D & O plaintiffs and will grant summary judgment in favor of the D & O plaintiffs on National Union's Separate Defense 11.

## IV. *CONCLUSION*

After considering the D & O plaintiffs' motion for partial summary judgment on certain policy-related defenses raised by National Union, the court will grant plaintiffs', motion with respect to National Union's Separate Defenses 8, 9, 10, 12, and 13, which relate to the endorsements 1–16. The court will also grant plaintiffs' motion with respect to National Union's Separate Defenses 7 and 11, which relate to policy exclusions 4(c) and 4(i). With respect to National Union's Separate Defense 6, which relates to policy exclusion 4(a), the court will grant in part and deny in part the plaintiffs' motion. The court will grant the motion with respect to claims based on allegations of securities fraud or breach of fiduciary duty and will deny the motion with respect to claims based on allegations of fraudulent transfer. With respect to National Union's Separate Defense 8 relating to exclusion 4(d), the court will grant plaintiffs' motion for summary judgment.

The court also finds that, subject to any remaining defenses, the National Union policy provides for up to $30 million of excess insurance coverage over any insurance collected from the St. Paul Program.

The court will issue an order consistent with this opinion.